## Appeal of MEYER HECHT.

Docket No. 2096.    Submitted May 25, 1925.    Decided July 11, 1925.

Salary deduction allowed by the Commissioner *held* to be reasonable.

*G. H. Engelhard, Esq.*, for the taxpayer.
*Willis D. Nance, Esq.*, for the Commissioner.

Before Ivins, Marquette, and Morris.

This appeal is taken from a determination by the Commissioner of a deficiency in income taxes for 1919 of $47,761.41, arising from the disallowance as a deduction of $94,309.02 of the $114,309.02 which the taxpayer claims to have paid to his son as salary in that year. The sole question at issue is the reasonableness of the deduction allowed by the Commissioner for such salary. The appeal was presented upon depositions and exhibits filed therewith.

### FINDINGS OF FACT.

The taxpayer in 1919 was in the hide business in New York City. He had been in that business for about forty-six years prior to 1919. Since 1889 he had been operating as a sole trader, in business for himself.

George J. Hecht, the only son of the taxpayer, was graduated from the College of Arts and Sciences of Cornell University in 1917, at the age of 22, with the degree of Bachelor of Arts, having taken courses in economics, business law, accounting, foreign languages, and other subjects. While he was in college he was business manager of the "Cornell Era," a college magazine. After graduation he was connected with the American Ambulance Field Service and the National Committee of Patriotic Societies for a time, thereafter going to Washington, where he served in the Bureau of Research of the War Trade Board, working on statistics of hides and skins and tanning materials, preparing certain reports, in the preparation of which he made use, among other sources, of information received from his father. After so serving for a period which is not shown by the record, he was enlisted in the United States Army as a private

and served in the Statistical Division of the General Staff, working on statistics of hides and skins, computing raw material require- ments for the Army.

The taxpayer, from the time of his son's birth, had planned taking him into his business and eventually making him his successor and heir.  On learning, in December, 1918, that his son was about to be honorably discharged from the Army, he wrote him a letter, in part, as follows:

As you said that the B & C matter was dropped, I today ordered a desk for you at the office, and we look forward to have you with us on the turn of the year.  I will not write much more than this—you know how I feel. The day of your entry into my business is what I have been looking forward to since the day you were born.  I am glad to think I have an heir to succeed to the business that I have worked up since I was a boy.  When I see you I will tell you more.

The son was discharged from the Army about December 18, 1918, and returned to his home.  Conferences were had between the tax- payer, his wife, and his son, at which the wife suggested that the son be taken into the father's business as a partner on a 50 per cent basis, but the father refused this, agreeing to take him into the business and give him 25 per cent of the net profits.  The taxpayer decided to do this partly by reason of the services he expected to receive and partly because the person with whom he was dealing was his son.  The son accepted.

On the first working day of the year 1919 the son went into the taxpayer's business.  The taxpayer furnished a large floral horse- shoe emblazoned with the legend " Success," and the employees of the taxpayer sent a large basket of roses.  The entire staff was called into the taxpayer's office and a photograph was taken of taxpayer, son, staff, and floral offerings.  The taxpayer furnished information to the " Shoe and Leather Reporter " and the " Hide and Leather Review," trade periodicals, which resulted in their publishing articles to the effect that the son had entered the tax- payer's business, mentioning the son's graduation from college and his war record, including the statement that he had founded the Bureau of Cartoons of the Committee of Public Information.

During the year 1919 the son devoted his entire time to the tax- payer's business, acting as assistant to the taxpayer in the man- agement, making business trips, inspecting hides, etc.

The son was not paid a regular salary during 1919, but drew such money as he needed—approximately $10,000 during the year. These withdrawals and the balance of his 25 per cent of the net profits were not charged to salary account on the taxpayer's books, but were entered on an account carried in the son's name.  At the

end of the year the balance of the 25 per cent due him was credited to him on such account.

The net profits of the taxpayer for the years 1912 to 1923, as shown by his books (before deducting the son's compensation in the years beginning with 1919), were:

| | | |
|---|---:|---:|
| 1912 | $107,042.86 | |
| 1913 | 71,094.09 | |
| 1914 | 71,660.67 | |
| 1915 | 163,107.50 | |
| 1916 | 193,739.67 | |
| 1917 | 138,231.90 | |
| 1918 | 62,597.80 | |
| 1919 | 457,236.09 | |
| 1920 | Loss. | $129,720.14 |
| 1921 | Loss. | 36,907.73 |
| 1922 | 97,941.73 | |
| 1923 | 115,301.66 | |

The taxpayer, in his 1919 income-tax return, claimed a deduction of $114,309.02 for salary paid to his son. The Commissioner disallowed $94,309.02 of this as unreasonable, and allowed as a reasonable deduction for such salary $20,000, determining the deficiency of $47,761.41 in income taxes above mentioned.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

Ivins: Section 214 (a) (1) of the Revenue Act of 1918 provides that in computing net income there shall be allowed as deductions all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, "including a reasonable allowance for salaries or other compensation for personal services actually rendered."

The question before us is, What constitutes a reasonable allowance for the salary or compensation of George J. Hecht for the year 1919 as an employee of his father, the taxpayer? He was paid $114,-309.02, but this was because 1919 was a year of phenomenal profits in the taxpayer's business, and George's compensation had been agreed upon on a contingent basis—he was to get 25 per cent of the net profits of the business.

The taxpayer's counsel urges that had George's compensation been at a fixed rate instead of contingent, $20,000 per annum would have been a reasonable rate for a man of his attainments, that if the business had not been phenomenal in 1919, but had merely come up to the average for previous years, the 25 per cent paid to George

would have come to about $20,000, and that therefore 25 per cent was a reasonable salary, if payment was to be on a contingent basis.

The only fault we can find with this syllogism is in its premises. George's idea of his own importance, which is expressed so forcibly in his testimony, seems to have impressed his counsel more than it impresses us. We are not persuaded that George's record justified a $20,000 salary as reasonable for him at the age of twenty-three. His business experience seems to have been confined to the management of the Cornell Era, a college magazine to which, in view of the fact that he received his degree, we believe he can only have devoted a part of his time when in college. He testified that under his management this magazine sold more pages of advertising than any other college magazine in the country. But he did not tell us whether this meant that the magazine carried ten pages of advertising in each issue, or twenty pages or fifty pages. George graduated from college in June, 1917, and in the following eighteen months did a number of different things. But the record does not tell us how long he did any one of these things. He was business manager of the American Ambulance Field Service in New York City, in which capacity he says he handled a large amount of money, whatever that means. The record does not show exactly what the business organization of the American Ambulance Field Service was. George testified that this business, together with the Cornell Era experience, was all the practical business experience he had had. After the American Ambulance Field Service he apparently put in some time with the National Committee of Patriotic Societies, but it does not appear what he did there, and then he went to Washington into the Bureau of Research of the War Trade Board where he worked on statistics of hides and tanning extracts, and compiled some reports. In compiling the reports he obtained valuable information from his father.

This record, coupled with the admission by the taxpayer that the arrangement made with George was induced in part by the fact that he was his son, and the taxpayer's testimony that other employees in his office, who were better qualified than George to handle the business, received salaries less than that allowed for George by the Commissioner, convince us that the Commissioner was not unreasonable in cutting down the allowance for George's salary to $20,000. The average net income of the taxpayer's business for the seven years 1912 to 1918, inclusive, was $115,353.48. If he had figured on a continuance of similar earnings and had agreed to give George 4 per cent thereof, such allowance would have been equivalent to over $4,500 a year in ordinary circumstances. We

hardly think that any greater percentage than this could be regarded as a reasonable allowance for compensation of a man twenty-three years old, with as little experience in the business or elsewhere as George's record shows. A 4 per cent compensation in the year 1919 would have amounted to $18,289.44, and we do not feel that the Commissioner erred in disallowing as a deduction on the part of the taxpayer so much of George's compensation as exceeded $20,000. •

The taxpayer's petition suggests that if the entire amount paid to George is not to be allowed as compensation, then the Board should find that the taxpayer and George were partners, and that the compensation paid to George was his partnership dividend. But the record fails to sustain any such theory. The taxpayer testified that he had been, since 1889, the proprietor of his own business; his income-tax return was made as that of a sole trader; George reported his earnings as compensation for services; it does not appear that there was any written partnership agreement, that the word *partner* was ever used as between the taxpayer and George, that George assumed any liability for any of the losses which the business might develop, that George was authorized to bind the business as a partner, or that he was ever treated in any way as a partner by his father, or held forth to the world as a partner. The only place in the record where the word *partner* appears is in the testimony of the taxpayer's wife, who stated that she urged her husband to take George into partnership on a 50 per cent basis, and that he refused.

The incidents surrounding the first appearance of George at his father's office, with its floral tributes and its photography, were stressed in the depositions to a point which led us to assume that the taxpayer desired to urge them as evidence of something, and we have accordingly made a finding of fact covering them. But this celebration can not by itself be said to constitute evidence of a partnership. We must hold that there is nothing before us upon which to base a holding that the taxpayer and George were partners.

It seems to us that the situation is merely that of a taxpayer who agrees to give a new employee 25 per cent of his profits as compensation because he is his son, when, if it had been a stranger, he would have given him 4 per cent or less. A reasonable allowance under the statute seems to us to be a sum or percentage such as the taxpayer would expect to give to a stranger equally qualified for similar services. The deduction allowed by the Commissioner seems to us liberal and we will not disturb his determination.

SMITH took no part in the hearing or consideration of this appeal.