L. SCHEPP COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42908. Promulgated January 29, 1932.

*J. S. Y. Ivins, Esq., Harry LeRoy Jones, Esq.*, and *Lemuel Skidmore, Esq.*, for the petitioner.

*John E. Marshall, Esq.*, for the respondent.

OPINION.

STERNHAGEN: Of numerous assignments of error in the respondent's determination of deficiency, there remain five principal issues to be decided by the Board, and these will be taken up in order.

1. *Salary.*—The petitioner paid Florence Schepp $20,000 in 1918 by crediting the amount to her personal account on its books, from which her personal bills were paid and debited. The petitioner deducted this amount among its business expenses, the Commissioner disallowed the deduction entirely, and the petitioner now assails this disallowance.

The Revenue Act of 1918, section 234 (a) (1), permits the deduction of

All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *.

Florence Schepp was the daughter of the founder of the business and in 1918 she and her father owned all of its shares, the father being the president—" the brains " and directing head of the company, and personally engaged in all phases of its business—and the daughter being the vice president. She was also a director. The specific services she performed for the company were slight, consisting of suggestions as to an improved canvas cover for the storage bins, assisting in the preparation of the negligible amount of advertising (the total cost of which was about $500), suggesting improved toilet and other sanitary facilities at the factory, consulting with her father about improved retail containers, acting as her father's amanuensis on a trip to Toronto, and discussing matters of a general nature with her father and with the secretary of the company. She had no desk at the corporation's office, failed to attend the one directors' meeting of the year, and sometimes made no appearance at the office for a week or more. The amount which was allotted to her varied between $3,000 and $25,000. The president's salary varied between $25,000 and $100,000, being $50,000 in 1918. The secretary received $6,000, and the treasurer $2,100. The latter were regularly employed and occupied in the petitioner's business.

The evidence before us supports the conclusion that the personal services actually rendered by Florence Schepp were not worthless, as determined by respondent. A reasonable allowance therefor, however, would not, in our opinion, exceed $4,000, and this has been found as a fact.

The petitioner argues that the judgment of the directors is presumptively reasonable and that the evidence supports the presumption; that the test of the statute must be applied to the single aggre-

gate amount of all officers' salaries; and that the aggregate sum of all salaries paid to its officers is reasonable in the light of petitioner's history and in proportion to corporate earnings. But, in our opinion, the argument must fail.

While the judgment of the corporate directors is not to be disregarded, there is no rule that it is conclusive or that it comports with the statutory qualifications of the tax deduction. Directors have a fairly free hand in fixing corporate salaries, and if the Government were seeking to prevent or set aside their payment, a heavy burden would be upon it. But, however honest may be the directors' judgment and however great their power to effectuate it, these do not determine the deductibility of such amounts under the tax law. For the purpose of determining taxable net income, the deduction is limited to amounts which are reasonably commensurate with the personal services actually rendered and thus are no more than ordinary and necessary expenses of carrying on the business. Hence the directors' duty to the corporation is no criterion of the Commissioner's duty to limit the tax deduction within the statutory bounds, and the two are not in conflict. When the Commissioner has made a determination, the taxpayer who attacks it must prove by evidence of the services rendered and their value that a correct determination would exceed that of the Commissioner. Where the payments are to kinsfolk or to shareholders, the proof must also show that they were not influenced by family considerations and were not disguised distributions of profits. See *Botany Worsted Mills* v. *United States*, 278 U. S. 282; *Becker Bros.* v. *United States*, 7 Fed. (2d) 3; *United States* v. *Philadelphia Knitting Mills*, 273 Fed. 657; *Benz Bros. Co.*, 20 B. T. A. 1214; *C. S. Ferry & Son, Inc.*, 18 B. T. A. 1261; *Home Industry Iron Works*, 8 B. T. A. 1267; *Meyer Hecht*, 2 B. T. A. 319; *Gustafson Mfg. Co.*, 1 B. T. A. 508.

The suggestion has not heretofore been considered in the decided cases that the deduction must be tested as an aggregate amount and that no single salary may be held nondeductible unless the sum of all salaries is too large. We think the statute requires no such construction. Each of the deductions of section 234 is described as a class, and several are described by the term " a reasonable allowance." To test the salary deduction by ascertaining the ratio of the aggregate salaries to net earnings or gross sales would result in the recognition of a mathematical gross maximum and either the disregard within that figure of any relation between individual service and the compensation therefor, however plainly disproportionate, or else the consideration of the sum of all services and the relation of the whole to the gross salaries paid. This would practically nullify the clear statutory language and be at variance with the judicial

tests laid down in the decisions above set forth. While it might superficially appear that the total paid to all four of petitioner's officers is small in comparison to its gross sales and net earnings, it does not appear that the amount credited to Florence Schepp is reasonable in comparison to her service. There is no evidence whatever of services and salaries actually performed and paid by and to other individuals in the same or comparable businesses, and no evidence of how much the company would have to pay to get someone else to do what Florence Schepp did. *Becker Bros.* v. *United States*, 7 Fed. (2d) 3; *Becker Bros.*, 9 B. T. A. 1260, affd., 37 Fed. (2d) 1010. But the evidence shows that there were services performed and as best we can we are required to fix the statutory deduction indicated by the evidence.

2. *Royalty.*—The petitioner claims the right to a deduction for 1918 of $34,745 as royalty " paid or credited " to Florence Schepp. It argues that Leopold and Florence Schepp had a valuable property right in the idea and design of the cake and bread boxes, and that a royalty computed at 4¢ a pound on all package cocoanut sold in such boxes in 1918 was deductible as an ordinary and necessary expense.

There are, in our opinion, several different reasons why the petitioner's claim can not succeed. Neither Leopold Schepp nor his daughter had such a property as would support a claim for royalty from this petitioner. Cf. *Thornburgh Mfg. Co.*, 17 B. T. A. 29, 34. There was neither a patent nor a copyright, nor yet a trademark, and, so far as this record shows, the subject matter of the alleged royalty was not susceptible of patent, copyright or trademark. There is nothing which can be called an invention. The subject is not the physical box, and it is not the design, style or decoration of the box. It is solely the idea of selling cocoanut to the retail trade in these containers in order to attract consumers—a mere method of distribution. No authority is cited which supports the view that such an idea is patentable or in any way property which the petitioner might not freely use or for the use of which it would be required to pay a royalty or other consideration.

But, passing that, it appears that the basic idea—namely, that of using cake and bread boxes—was disclosed by Schepp before incorporation and was adopted by the corporation with his full knowledge and consent as part of the business which it acquired in 1901 in exchange for its shares. The subsequent modifications of the box may be regarded as incidental improvements of the predominant idea, and made while Schepp was employed by the corporation. The 1918 model dates back to 1908 or earlier. During all this time Schepp knowingly consented to and promoted the extensive use of the idea and permitted the corporation to incur obligations for the

manufacture of such boxes and the distribution of its product in them. He would have been completely estopped either to prevent such use or to demand payment therefor. Cf. *Gayler* v. *Wilder*, 51 U. S. 477; *Marsh* v. *Nichols, Shepard & Co.*, 128 U. S. 605; *Baldwin Co.* v. *R. S. Howard Co.*, 238 Fed. 154; certiorari denied, 243 U. S. 636.

Since he was in no position to impose upon the corporation any obligation, it can not be said that any amount which he, the principal shareholder, might cause the corporation to pay was a royalty or otherwise an ordinary and necessary expense of the business. There is no occasion to consider whether the amount was reasonable. It seems plain that whatever amount was paid or credited was a mere distribution of profits to the sole shareholders under a misnomer. The resolution of 1917 adds no legal sanction to the royalty claim,—and this is especially so as to the 4 cents claimed for 1918, as the resolution is by its terms confined to 1917, and provides for a 6½-cent payment.

In 1915 the "royalty account" was first established, and credits thereto were made without the name in the ledger of any obligee thereof. Had there actually been an obligation to either Leopold or Florence Schepp for royalties there might have been some ground for treating the credits to the royalty account or the royalties payable account as book accruals of liability. But since, as has been seen, there was in substance no such liability, the mere crediting of the amounts in these royalty accounts can have no force to prove the deductibility of the items.

Not until 1921 is there an attempt to reflect on the ledger an obligation to Florence Schepp, and even that attempt is surrounded by ambiguity. At that time the royalty account contained credits accumulated since 1915 of $306,378.66. Against this was now made a debit entry of $283,635.06, a check was drawn to the order of Florence Schepp and deposited apparently to the credit of the corporation and so entered in its cash book. Thereafter the amount was credited to the Florence Schepp loan account. Why this roundabout course was taken is not explained. If the royalty credit had already represented an incurred liability to Florence Schepp, there was no occasion for any further accounting until the liability was discharged. The drawing of the check in 1921 was only a simulation of payment, because simultaneously it was deposited to the corporation's account. The credit then entered in the Florence Schepp loan account would indicate that she, having been paid her royalty, was now lending the amount to the corporation. All this was clearly fictitious accounting, regardless of the fact that it was carried on until 1926 and 1927. And the fact that Florence Schepp projected

the fiction into her personal-tax return, made on the cash basis, by including as gross income actually received in 1918 the $34,745 which, as has been seen, she did not actually receive in that year, does not give substance to the corporation's deduction. Its only significance is to indicate the care and thoroughness with which the plan for the deduction was attempted to be fulfilled.

We are of opinion, therefore, that there was no basis for a royalty and that no liability for an ordinary and necessary business expense was paid or incurred in the taxable year in question. The respondent correctly determined that the item claimed was not a deduction.

3. *Invested Capital.*—On its return the petitioner included in its invested capital of January 1, 1918, the amount of $197,189.92 which had been entered in its books in 1917 as a credit to surplus taken from Leopold Schepp's personal account. The respondent, in determining the deficiency, held that this amount was not within petitioner's statutory invested capital. Petitioner now claims not only that this amount falls within invested capital, but also that the entire amount of $523,537.22 should be restored to its statutory surplus. It argues that, notwithstanding the resolution and accounting of 1912 and the more substantive facts of that period, the amount did not actually leave the corporation's surplus; and, furthermore, that if it did go out of surplus, then $197,189.92 of it came back by the reversing entry of 1917.

We are of opinion that the evidence supports the respondent's determination and establishes that no part of the $523,537.22 is within invested capital of 1918. The question is limited to section 326 (a) (3), Revenue Act of 1918, which includes in invested capital " paid-in or earned surplus and undivided profits," there being no contention and no evidence that the amount represents cash or property, tangible or intangible, paid in for stock or shares.

On February 20, 1912, the directors, upon motion of two of their number who were minority shareholders and employees, voted to distribute the accumulated surplus; and on March 1, 1912, with express reference to this vote, the amount of $523,537.22 was credited to L. Schepp and debited to the various reserve accounts which had been set up on petitioner's books as a method of appropriating surplus. No objection was made to this at that time or afterwards by any shareholder. A year later Leopold Schepp acquired all the shares of others except those of his daughter.

That the distribution of 1912 was more than an empty bookkeeping entry is clear. It completely wiped out Schepp's debit balance of $379,940.87, giving him a credit of $143,596.35 (which was less than the figure of $197,189.92). To the extent of $379,-940.87, there was an immediate disposition and appropriation of

the surplus. Of the remaining $143,596.35, withdrawals were made by Schepp, so that by June 25, 1912, his balance was reduced to $92,903.44, there having been no intervening credits. At the end of the year 1912 it was still only $186,171.41, or less than the $197,-189.92; a year later it was $95,262.49, and a year later, on December 31, 1914, after having the day before dropped below $60,000, it was still only $146,730.50. Not until December 31, 1915, more than three years after the original distribution, was Schepp's credit ($202,502.05) sufficiently high to be free from the need of the $197,189.92.

In view of this treatment of the surplus in a way consistent only with its complete appropriation by Schepp, there is no merit to the argument that the resolution and book entry were ineffective. Petitioner urges that after so carefully setting up these various reserves, it is not to be believed that there was an intention to wipe them out by distribution, and this to a single shareholder. But the directors had the right to do so, and the direct evidence that they did so without complaint from shareholders leaves no room for debate as to the wisdom or reasonableness of their action. We see nothing either in the resolution itself or the surrounding circumstances to support the petitioner's contention that only an ordinary dividend of 2 per cent or 4 per cent was intended by the resolution. Nor is the effectiveness of the distribution lessened by the fact that it all went to Schepp. A distribution may be valid although not apportioned to shareholdings, and when the shareholders make no objection the corporation itself has no ground for attack. *Joseph Goodnow & Co.*, 5 B. T. A. 1154; *Henry F. Michell Co.*, 16 B. T. A. 1297; cf. *Leo G. Hadley*, 6 B. T. A. 1031; 36 Fed. (2d) 543.

The decision in *Eaton* v. *English & Mersick Co.*, 7 Fed. (2d) 54, although somewhat similar, is not sufficiently so to be controlling. The court found that the resolution was itself not a declaration of dividend, that in fact it was not so intended, that in fact it was not so treated, and that under Connecticut law it could not be so held. All of these circumstances led the court to hold that surplus had not in fact been reduced. In the present case there was a deliberate recognition of the distribution in the conduct of everyone concerned. *Flynn* v. *Haas Bros.*, 20 Fed. (2d) 510, was likewise predicated upon the lack of substantial recognition of a distribution by the corporation or the shareholders, holding that the resolution and book entry alone did not give substance to the alleged distribution as against conduct showing intent to be otherwise. Here the resolution is clear and has never been revoked or changed, the corporation acted upon it by crediting the amount to Schepp, wiping out his indebtedness and permitting him to draw upon the balance, as he did, and there is no evidence that the corporation ever intended otherwise and no

inconsistent acts or conduct. Cf. *Elgin Butter Tub Co.*, 12 B. T. A. 1313. In our opinion, therefore, the amount was not paid-in or earned surplus in 1918 and is not to be included in petitioner's invested capital.

But, argues the petitioner, at least the $197,189.92 must be included in invested capital because before 1918 it was effectively restored to surplus by the journal entry of 1917. This, we think, is not so. In contrast with the substantial effect of the entry of 1912, we find no substance whatever in the entry of 1917. It purported only to reverse *pro tanto* the entry of 1912 (1911 was obviously an error) upon the supposition that it was erroneous as to the profit and loss surplus as no authority for it could be found. As we have seen, there was full authority for the entry in the resolution of distribution and it was not erroneous. Surely there is no reason to say it was at the same time erroneous as to $197,189.92 and effective as to the rest. The entry was made by an accountant who knew nothing about the facts and who acted without instructions from the secretary or, so far as the record shows, from anyone else. It was not made as a record of any fact or transaction which substantively took place.

Furthermore, as has been seen, the 1912 credit of $523,537.22 immediately wiped out Schepp's debit of $379,940.87 and within four months thereafter was further withdrawn, bringing the remaining credit balance down to $92,903.44 at the end of June, 1912, and was not for three years above the $197,189.92 figure. If it be suggested that these figures are not reflective of the true condition because of the omission ratably to accrue salaries monthly, it may be said that, so far as the evidence discloses, the entry upon the books of accrued salaries would still leave Schepp's credit balance for the same period at a figure below $197,189.92. Thus it appears that, not only was the amount authorized and credited, but it was actually appropriated by Schepp in part immediately and in greater part soon after. The credit went on for over five years at Schepp's individual disposal. In view of this record and the conduct of the persons acting under it, there is no support for a contention that as to this lesser amount the surplus was never reduced. And having been reduced in fact, so that Schepp had and exercised a right in respect of it, it would require more than an entry on the corporation's books to bring it back into the corporation's rightful surplus. So far as the evidence shows, Schepp neither gave back the amount nor acted so as to estop himself to deny it; and, as has been seen, the entry itself appears merely as an accountant's mistake. Under these circumstances, *L. H. Manning & Co.*, 10 B. T. A. 633, is not controlling.

The petitioner, in our opinion, had no right to include the $197,-189.92 in its invested capital and respondent correctly disallowed it; nor has petitioner any right to have its invested capital increased by including any part of the $523,537.22. The respondent is sustained. Adjustment will be made as stipulated in respect of petitioner's inadmissible assets.

4. *Stock Trading Losses.*—The petitioner deducted $268,692.50 as a loss sustained by it in 1918 in dealing in securities. The respondent disallowed $267,875 because it was not sustained by the petitioner, and extensive proof of the circumstances has been made by the petitioner in an effort to establish the loss as its own. This circumstantial proof has been substantially all set forth in the findings and need not be repeated. In our opinion, it not only falls short of proving a loss by the petitioner, but rather strengthens the respondent's determination that the loss was not that of the petitioner.

The difficulty and such doubt as there is on this point are attributable to Schepp and the corporation. Instead of conducting their businesses clearly and distinctly separately, they voluntarily mingled them with resulting uncertainty and confusion. To Schepp the corporation was a mere convenience and, since he was accountable to no one else, he treated it as such without strict regard to the integrity of its separate function. As between him and the corporation, it was of no importance how their financial affairs were accounted for. If, therefore, the evidence upon the present issue prevents an affirmative conclusion favorable to petitioner, the failure is chargeable to petitioner and its officers and need arouse no feeling of hardship.

The corporation in prior years made no pretense of marginal trading in securities. Such trading was not its ordinary function. Schepp, on the other hand, had carried on speculative trading for a number of years, and had consistently claimed the right to deduct the resulting losses. It was only because the Government denied this right (whether rightly or wrongly) that the attempt was made to attribute the losses to the corporation. The first definite and unequivocal act of recognition by the corporation to this end was the book entry of December 31, 1918, after the transactions of the year had taken place. This was the first such entry on the corporation's general books. The blotter which had been currently used to note the stock transactions was a memorandum book and entirely independent of the corporation's accounts in so far as marginal trades were concerned. No current postings were made from it to the corporation's general books and, so far as appears, the

marginal trading shown by the blotter was not reflected in any trial balance or other periodic financial summary. Indeed, in the first instance, the losses were reflected in Schepp's personal account, and only at the end of the year credited to him and debited to the corporation's profit and loss. On the other hand, there were contacts between the blotter and the cash book as to a few investment transactions, admittedly of the corporation, in Liberty bonds and stocks. The testimony of the witnesses added no certainty to the record in lieu of this indefiniteness of the bookkeeping. Even if any of the margin transactions could be attributed to the corporation, it would be necessary to exclude those prior to September, when, as shown by the evidence, Schepp is said to have first determined to have the corporation trade in stocks. But, in view of our decision as to the transactions of the entire year, it is unnecessary to discuss the force of the evidence in this respect.

We hold that the petitioner did not sustain the losses claimed as the result of stock margin transactions. Adjustment should be made to allow the loss of $5,788.62 sustained in the sale of Liberty bonds.

The petitioner argues that, since the respondent has imposed a fraud penalty predicated upon this deduction, it is the respondent's burden to prove not only the elements of fraud, but also the error of the deduction. This, in our opinion, is an unsound view. It confuses the substantive issue, whether the losses were sustained by petitioner, with the issue whether, in taking such a deduction petitioner wilfully understated its income for the purpose of evading its lawful taxes. These issues are clearly separate, for, although the determination of fraud necessarily implies falsity in the claim of loss, yet the respondent can and may determine the deduction to be based on a false or incorrect claim and still find no justification for imposing the fraud penalty. In either event his determination disallowing the loss deduction is by law presumed to be correct, while his determination of fraud carries no such presumption because section 601, Revenue Act of 1928, amending section 907 (a), Revenue Act of 1926, provides:

* * * In any proceeding [before the Board] involving the issue whether the petitioner has been guilty of fraud with intent to evade tax * * * the burden of proof in respect of such issue shall be upon the Commissioner. * * *

It is not difficult to separate and distinguish these issues in a case such as this. Deductions are frequently taken through error of law or fact which involve no suggestion of fraud. They require no consideration of intent, motive or conduct in making the return. Bona fides is not questioned, in either the moral or unmoral sense of that term. The question is only whether the deduction was unfounded in fact or law. When, however, the Commissioner adds

a fraud penalty, he in effect asserts that fraud has been practiced in the return; not merely that the transactions in which the deduction is grounded lacked bona fides, but that, whether or not the transactions were themselves bona fide, their treatment in the return embodied a fraudulent understatement. As to the issue raised by his determination of fraud, the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside.

The petitioner cites two decisions, *Taplin* v. *Commissioner*, 41 Fed. (2d) 454, and *Budd* v. *Commissioner*, 43 Fed. (2d) 509, decided by the Circuit Courts of Appeals of the Sixth and Third Circuits, respectively. These cases, however, do not, in our opinion, support petitioner's view. In respect of sales ultimately held to have been made, the Commissioner had challenged their bona fides and determined that they were sham and hence that no losses were sustained. He had not determined fraud or imposed penalties. The courts, however, held that his determination of lack of bona fides was essentially a determination of fraud, and, since fraud is never presumed, that the burden was upon the Commissioner who had in effect asserted it. In the *Budd* case, the court regarded the above quoted provision of section 601 of the 1928 Act as applicable to not only a direct issue of fraud, but also the issue as translated from the challenge of bona fides when no penalty was imposed.

This we have difficulty in understanding. But there is no difficulty in seeing the difference between those cases and this. Here there is no doubt as to whether the transactions were genuine or sham. That such sales occurred is admitted by all, and the Commissioner does not intimate that they lacked vitality. The entire question is whether these recognized transactions were by petitioner. The respondent's determination that they were not by petitioner is not *ipso facto* the equivalent of a charge of fraud. It may represent either a difference of view as to the legal significance of facts or a difference in inferences of fact to be drawn from a confused mass of evidence. To say that, standing by itself, it was the same as a fraud charge, and upon that translated premise, to apply section 601 and throw the burden of proof upon respondent, would be merely a confusion of issues which generally and by statute are readily distinguishable.

Nor can we say that the burden as to the loss deduction is on respondent because of the statements and conduct of the several examining revenue agents. There was, according to the present record, sufficient ground to disallow the claimed deduction; and upon

this the respondent made the definitive determination which petitioner assails. We are far from the opinion that this determination is so wholly arbitrary or wanting in probable foundation or merit as to require evidence in the first instance to support it. See *Pennant Cafeteria Co.*, 5 B. T. A. 293; *Jacob F. Brown*, 18 B. T. A. 859, 867; *Edgar M. Carnrick*, 21 B. T. A. 12, 21; *Benedict Crowell*, 21 B. T. A. 849, 851; *James P. Gossett*, 22 B. T. A. 1279, 1284.

5. *Fraud Penalty.*—Having held as we have that the petitioner did not sustain the loss which it deducted, it becomes necessary to decide whether the respondent has correctly determined that a fraudulent return was wilfully made by the petitioner corporation with intent to evade tax, and added to the tax 50 per cent of the amount of the deficiency. Section 250 (b), Revenue Acts of 1918 and of 1921; section 275 (b), Revenue Acts of 1924 and of 1926; section 293 (b), Revenue Act of 1928. Upon this issue the burden is, by section 601, placed upon the respondent. The issue is restricted by respondent's specification that the fraud is in the deduction taken for losses sustained in marginal trading in stocks. Since respondent makes no specification of fraud in respect of any of the other items in the return which have been determined by him and held by us to be incorrect, our consideration of fraud leaves out those items entirely.

We can not, however, escape the definite view that in taking the deduction for stock-trading losses on its return, the petitioner and its officers wilfully acted contrary to the truth within their knowledge and that it deliberately made false statements on its return for the purpose of evading its lawful tax. No one reading this record could reasonably escape the belief that the petitioner's president and its secretary were astute and intelligent business men who were fully aware of the facts and implications of their business and reasonably cognizant of the general effect upon the corporation's tax liability of its acts and transactions. There is no room for an extenuating plea of ignorance or inadvertence. What was done was done deliberately and knowingly. That it was done incorrectly appears not only from our foregoing discussion in the light of the burden of proof which rested on petitioner, but also from a consideration of the evidence irrespective of the petitioner's burden. In other words, giving full consideration to all the evidence, we are clearly of opinion that the petitioner did not engage in the marginal transactions and hence that it sustained no loss on account thereof. As to the years earlier than 1918, this is practically beyond dispute. When the trading accounts were opened they were intended and understood to be the transactions of Schepp individually. For several years this was the accepted fact. These accounts were never closed, and, in 1918, Schepp had

no intention of closing them. (The #11 account was expressly closed in a later year.) No new accounts were opened in 1918 at any time before the end of the year. Only two things happened to give any color to the notion that the account became that of the corporation—one, that Schepp sometime in 1918, probably as late as September, told Belgard that the accounts with Miller & Company would be those of the corporation, and, two, that the corporation, on December 31, 1918, at Schepp's direction, transferred the net loss which appeared in Schepp's personal account on its general books from such personal account to its own profit and loss account. The testimony of the broker's representative indicates no change in the handling of the accounts or the responsibility of Schepp. The accounts continued to be carried by the same anonymous designations with Schepp's individual guaranty.

But even these two facts, if they proved that the corporation were engaged in trading with Miller & Company, would affect only such transactions as took place subsequent to the president's determination and announcement. Thus the many transactions of the first two-thirds of the year would still remain those of the individual, and such of the deducted losses as resulted therefrom were entirely beyond the reach of the corporation. Belgard testified orally that Schepp's statement to him was made " sometime in 1918 " and " I think the early part," while the petitioner's written statement to the Bureau which Belgard verified in writing was that " after September 16, 1918, and prior to the closing of the books for 1918 " the determination of Schepp and his daughter was made. This deliberate written statement verified by Belgard is more reliable than his vague recollection at the hearing. So, in any event, the petitioner knowingly and deliberately founded its deduction upon a great many transactions with which it had no connection and from the result of which it had not suffered. Of course its voluntary book entry at the end of 1918, even if it were an assumption of the misfortunes of the year, would be gratuitous and not a loss.

The rationale seems to have been that Schepp had suffered trading losses which, despite his protests, the Bureau had persistently disallowed as deductions; thereupon the corporation began to deduct them, regardless of whether it had suffered them or not, and the books were by a single closing entry adjusted to that end. This we think was without warrant in law, deliberately contrary to fact, and hence within the statute prescribing the penalty.

Schepp died in 1926, and consequently his presence and testimony were not available at the trial in 1931. This has caused us to ponder long upon this determination of a fraudulent return. The petitioner criticises the respondent for making this determination after Schepp's

death. Our function, however, is to consider the evidence as it appears and decide whether it establishes the fraud which respondent has determined. If, as has been found, the corporation was guilty of fraud, it may not escape the prescribed penalty either on ethical grounds relating to the respondent's method of investigation or out of too high a regard for its deceased president. Its responsibility for his official acts did not ·lapse with his death, and when a penalty is determined and presented to this Board for review under the rules of evidence, the decision may not be deflected by a charge that the investigation was not timely. The statute clearly intends a fraud charge to be without limitation of time, and it places the burden of proof on respondent. We have no authority to add a standard of conduct as a further condition. *Ernest M. Bull, Executor*, 7 B. T. A. 993, 1000; *James Couzens*, 11 B. T. A. 1040, 1148, 1158. It should be said, however, that we have given full consideration to the possibility that Schepp's testimony might have served to strengthen petitioner's defense, and have in the light of that possibility weighed the evidence with the utmost care. It is only because the evidence of fraud is compelling that we have reached this conclusion, however regrettable it may be that the record may not contain Schepp's testimony on the subject.

It is also urged by petitioner that respondent's affirmative evidence upon the fraud issue utterly fails to support the determination. If the respondent's statutory burden of proof could be discharged only by means of the testimony of the Government witnesses brought forward in his behalf, we should at once say that such testimony was inadequate to sustain the charge of fraud. But we do not understand that this is what the respondent's burden of proof means. The question is whether upon the entire record properly before the Board the conclusion is fairly to be drawn that fraud was committed. Doubts and omissions are to be held against respondent. His is the risk of failure—not of failure to bring forward enough witnesses or enough testimony through his own witnesses, but of failure to submit a record of persuasive evidence of fraud. His risk is only that the truth may be contrary to his determination, not that he or his organization may not have been aware of it. If the weight of all the valid evidence properly in the case is such as to establish fraud, his burden is discharged; and it matters not by which of the opposing parties the evidence was introduced or in what order it was received. Adjective considerations of convenience as to the order of proof may· arise at the trial, but they do not affect the ultimate question whether the evidence adequately supports the respondent's determination.

The penalty is sustained at 50 per cent of the amount of the deficiency.

6. Other issues have either been withdrawn by petitioner or conceded by respondent, and the parties can readily, in accordance with their statements made at the trial and appearing in the record, readjust the deficiency in respect thereof.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

LANSDON dissents.

SMITH and BLACK dissent as to the imposition of the fraud penalty.

VAN FOSSAN, dissenting in part: It is elemental that fraud must be proved by clear and convincing evidence; a mere preponderance is not sufficient. When the evidence in this case is subjected to this test, I find myself unable to concur in the imposition of the penalty for fraud.