Claremont Waste Manufacturing Co. v. Commissioner.
Claremont Waste Mfg. Co. v. Commissioner
Docket No. 3361.
United States Tax Court
1945 Tax Ct. Memo LEXIS 272; 4 T.C.M. (CCH) 301; T.C.M. (RIA) 45088; March 12, 1945
Robert Ash, Esq., Munsey Bldg., Washington, D.C., and C. I. Drayton, C.P.A., for the petitioner. James T. Haslam, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: Petitioner contests deficiencies in income and excess profits taxes for the calendar year 1941 in the respective amounts of $5,297.39 and $13,138.02. The returns in question were filed with the collector for the district of New Hampshire at Portsmouth. Two questions are presented, (1) whether the compensation paid to petitioner's two officers for their services in 1941 was reasonable, and (2) whether the cost of certain repairs to one of petitioner's buildings was a deductible expense or a capital expenditure. Findings of Fact
*273 Petitioner is a New Hampshire corporation with its principal office and place of business in Claremont, New Hampshire. It was organized in 1915 with a capital stock issue of $24,000. Additional capital stock was issued from time to time until 1938, bringing the amount of issued and outstanding capital stock to the present total of 2,000 shares having aggregate par value of $200,000. All of the outstanding stock was paid for in cash and is owned by the members of one family. Bertha Steinfield and her son, William, each own 333 shares, and Frank and Samuel Steinfield, two other sons, each own 667 shares. At all times since its organization, petitioner's activities have been conducted by Frank and Samuel. Petitioner's board of directors consists of Frank, Samuel and William Steinfield. Samuel Steinfield is president and treasurer and Frank is vice-president and clerk (secretary) of petitioner. Frank has charge of production as plant superintendent or manager. Samuel is in charge of sales, purchases, advertising, credits and collections. Petitioner has no other officers. Petitioner is engaged in the manufacture and sale of a product known as "flock." Flock making is a long established *274 business not confined to petitioner. Flock is an almost powder-like product obtained by cutting cotton, wool, silk, rayon, or other fibers, usually from waste materials of clothing manufacturers, into uniform and nearly microscopic lengths. Flock has a number of uses. It may be applied by means of an adhesive to almost any type of surface, producing a pile like that of suede or velvet, depending upon the nature of the flock used. By first printing or stenciling an adhesive base on fabric or paper, flock may be applied as a decorative medium to achieve any design or pattern. It is also used widely as a binder or filler in the manufacture of plastic products. Colored flock produced by petitioner is dyed in its own plant. The machines on which petitioner first started the manufacture of flock turned out a product that was not uniform in length and contained flakes and threads which had escaped the cutters. The use of such flock made the end product defective, and the market for flock was thereby limited. In 1935 petitioner installed a new machine, which was developed by Frank and Samuel Steinfield and manufactured at petitioner's plant. Additional machines were installed in 1938 and *275 1941. These machines are protected by patents applied for and granted between 1935 and 1942. Each new machine has a productive capacity greater than that of 15 of the old style machines, and the end product is uniform and free from flakes and threads. As a result of the installation of these machines the potential market for flock was greatly expanded. Samuel and Frank have devoted all of their time to the business of petitioner since its organization. They have kept in close touch with users and prospective users of flock and have given them valuable advice and technical assistance. The flock requirements of petitioner's customers vary considerably with respect to fiber length, color, luster and chemical reaction of the dye used. Difficulties in applying flock to particular types of surfaces often present problems which must be solved before the sale of flock can be made. Samuel and Frank have worked continually with customers, prospective customers, makers of adhesive substances, and manufacturers of spray guns to meet the needs of customers and to promote increased use of flock. Their efforts in this respect have been remarkably successful. Users of petitioner's flock testified *276 without contradiction that petitioner's technical assistance and the quality of its product are without equal in the field. In 1941 the services of Samuel and Frank were of the same general character as in all other years, insofar as customer service was concerned, although nothing basically new was developed by them in that year. Samuel and Frank Steinfield first received salaries of $25 per week each, with increases from time to time until 1927 when they each were raised to their present basic salary of $100 per week. The board of directors passed a resolution in 1932, when the capital of petitioner was $40,000, providing that Samuel and Frank should each receive their fixed annual salaries of $5,200 plus 50 percent of the net profits in excess of $20,000 in lieu of an increase in salaries. That arrangement was changed in 1935, when the capital was $80,000, by a provision that in addition to the fixed annual salary of $5,200 they should each receive 25 percent of the net profits in excess of $30,000. A further, and last, change was made in February, 1937, whereby each received 25 percent of the net profits in excess of $45,000 in addition to their fixed salaries of $5,200 a *277 year; that arrangement remained in force during the calendar year 1941. In 1937 petitioner's capital was $160,000. The following tabulation shows sales, compensation paid to officers, net profit, and dividends paid for each of the years 1936 through 1941: Year
Sales
Compensation
Net Profit
Dividends
1936
$491,702.95
$ 52,726.16
$ 81,152.25
$140,000.00
1937
539,305.79
60,646.04
108,996.39
100,000.00
1938
350,267.37
10,400.00
59,961.28
80,000.00
1939
490,570.37
32,418.92
78,361.46
70,000.00
1940
514,087.03
42,701.49
92,491.36
66,000.00
1941
664,964.34
75,308.34
111,642.75
60,000.00
TOTALS
$274,200.95
$532,605.49
$516,000.00
Petitioner sold 2,298,381 pounds of flock in 1940 and 3,749,895 pounds in 1941. Prior to 1940 sales did not in any year exceed two million pounds. The marked increase in sales during 1941 and petitioner's success generally are the direct result of the promotional sales work, ingenuity and efforts of the Steinfield brothers. Neither of the Steinfields received commissions on his sales. Petitioner employs no salesmen. Of the $75,308.34 aggregate compensation paid to Samuel and Frank Steinfield in *278 1941, respondent, in his deficiency determination, allowed $50,000 as a deduction and disallowed $25,308.34 on the ground "that officers' salaries claimed in excess of $50,000.00 for the year 1941 represents unreasonable compensation for services rendered * * *." The salaries paid Samuel and Frank Steinfield for 1941 were reasonable compensation for their services. Petitioner occupies two brick and four frame buildings which were from thirty to forty years old when purchased in 1915. One of the buildings is built over a canal which was once used for power purposes. In 1941 high water damaged the building's underpinning. Continued use of the building required the expenditure in that year of $4,230.52 for labor, beams, iron columns, sand, and cement. No repairs were made to the upper structure of the building and no repairs were made to any of the other buildings at that time. Opinion Two issues are presented for our consideration, one dealing with the reasonableness of compensation paid petitioner's officers and the other with the deductibility of expenditures made to restore a damaged building to usefulness. The two officers whose compensation petitioner seeks to deduct under *279 section 23(a)(1)(A) have devoted all of their time and efforts to petitioner's business since its organization in 1915. Their ingenuity in developing new processes and new markets is entirely responsible for petitioner's success. For several years petitioner has been compensating these men by giving each of them a basic salary of $5,200 plus 25 percent of the net profits in excess of $45,000, which is 22 1/2 percent of invested capital. Under this plan the officers were paid total compensation of $75,308.34 in 1941. In that year petitioner's net profits were $111,642.75. The evidence is set forth fully in our findings and need not be recounted here. Respondent contends on brief that no testimony was offered to show by way of comparison "compensation paid to persons similarly engaged or any other measure of value"; that the petitioner, therefore, has failed to sustain its burden of proof. There is no single criterion upon which reasonableness of compensation depends. Whether compensation is reasonable or not must be determined by a consideration of all the facts and circumstances of record. We think a review of the record in this case leads inevitably to the conclusion that the compensation *280 sought to be deducted constitutes "a reasonable allowance for salaries or other compensation for personal services actually rendered" within the purview of section 23(a)(1)(A). See Klug & Smith Co., 18 B.T.A. 966; Heywood Boot & Shoe Co. v. Commissioner (C.C.A. 1st Cir.), 76 Fed. (2d) 586 (reversing 29 B.T.A. 1188). Respondent in our opinion places undue weight upon the substantiality of the increase over 1940 compensation. This, of course, is an element to be considered along with other facts and circumstances of the case. However, we are not here concerned with the reasonableness of 1940 compensation or whether or not the officers were entitled to an increase. The question is whether the compensation paid in 1941 was reasonable under the circumstances. We think it was. The contention that petitioner has failed to sustain its burden of proof by not producing evidence as to the compensation paid to persons holding comparable positions with petitioner's competitors is, in our opinion, without merit. We agree that such an inquiry is proper where there are comparable businesses, operating under similar circumstances and with somewhat the same *281 degree of efficiency. Even then such a test would be only one of many factors to be considered. Certainly a comparison would be futile where, as here, the evidence shows that the quality of petitioner's product and the services rendered by petitioner through its officers were unique in the field. Nor do we find merit in the contention that the payments in question should be regarded as dividends in disguise. Such a conclusion would seem to be justified only if the alleged compensation were in accordance with stockholding interests and had no true relationship to actual services rendered. Cf. L. Schepp Company, 25 B.T.A. 419. As to the repair issue respondent contends that expenditures made to restore the underpinning of a building damaged by high water of a canal are not deductible as repair expenses but constitute capital expenditures. Respondent relies upon section 24(a)(2) and (3), [1] arguing that "While the greater portion of the amount expended was for labor, the remainder was expended for beams, iron columns, sand, and cement, materials of a nature which greatly extend and prolong the life of a wooden structure." It is agreed that the continued use of the building *282 required the restoration of the underpinning; that no repairs or improvements were made with respect to the upper structure of the building or to any of the other buildings of petitioner. In Illinois Merchants Trust Company, Exec., 4 B.T.A. 103, we set forth our views as to the difference between repairs and capital expenditures as follows: * * * In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to amend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily *283 efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. This definition is equally applicable today, and, in our opinion clearly requires the conclusion that the expenditures here involved are properly deductible as repairs, for they did not prolong the normal life of the building or increase its value; they merely restored the building to its normal expectancy. After the repairs the building was used for the same purpose as before, and it was no better adapted for that use than it was before the damage occurred. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code. SEC. 24 ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - * * * * *
(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate; (3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made;↩