Canal Navigation and Trading Company, Inc. v. Commissioner.
Canal Navigation & Trading Co. v. Commissioner
Docket No. 12180.
United States Tax Court
1947 Tax Ct. Memo LEXIS 120; 6 T.C.M. (CCH) 909; T.C.M. (RIA) 47222; July 31, 1947
*120 Bert Flanders, Jr., Esq., for the petitioner. Allen T. Akin, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies in income and excess profits tax liabilities for the year 1941 in the amounts of $1,438.93 and $5,223.85, respectively. Petitioner contends that in making the determination of deficiency, the Commissioner erroneously disallowed $5,500 of the total of $10,000 paid to its three officers and directors for the period of May 17, 1941, to December 31, 1941. From evidence both documentary and oral, we make the following Findings of Fact Petitioner is a corporation organized and existing under and by virtue of the laws of the State of Louisiana, having its principal office and place of business in the City of New Orleans, Louisiana. Petitioner was formerly known as Stemwinder, Inc. (the name being changed by proper amendment to its charter), in which name its income and excess profits tax returns for the year 1941 were filed with the collector of internal revenue at New Orleans, Louisiana. Stemwinder, Inc., was organized by the three stockholders of the Canal Barge Company, Inc. *121 (referred to hereafter as the "Barge Co."), on May 17, 1941. At the time of the organization, the capital stock paid in was 10 shares at $100 per share and was owned as follows: Joseph M. Jones
6 shares
60 per cent
Thomas Jordan
3 shares
30 per cent
Harry B. Jordan
1 share
10 per cent The objects and purposes for which petitioner was organized, as stated in the Articles of Incorporation, are as follows: "To carry on a general freight, transfer and forwarding business utilizing primarily the rivers, lakes, bayous and canals in this State and elsewhere and on the high seas or arms thereof; to own, lease, maintain and operate barges, ships, tugboats and other vessels and instrumentalities usable in water transportation, also to own, lease, maintain and operate freight terminals and warehouses within the State of Louisiana or elsewhere as may be permitted by law, and generally to do any and everything necessary incidental or complimentary [sic] to the business of a carrier of freight for hire, a general transfer, warehouse business and freight forwarding business." The Barge Co. was engaged in the business of transporting bulk petroleum products as a contract *122 carrier on inland waterways and in interstate commerce. It was permitted by its charter to carry products other than bulk petroleum products as a common carrier as well as a contract carrier. During the year 1941 the Barge Co. owned four tug boats or tow boats and 16 to 18 barges. In May 1940, the tug boat "Bill" owned by the Barge Co. burned. The officers of the Barge Co. contracted with the General Motors Corporation to build a new tug for the Barge Co., to be known as the "Stemwinder." Actual work first began on the "Stemwinder" in August 1940. At the time the "Stemwinder" was ordered, Barge Co. owned a tow boat known as the "Bull Calf." The "Bull Calf" had a 650 horsepower engine and a seven foot draft while the "Stemwinder" was to have a 750 horsepower engine and an eight foot draft. In March 1941, Joseph M. Jones, vice president of Barge Co., wrote to Tom Jordan, president of that company, that he had advised the General Motors Acceptance Corporation of their desire to organize a separate corporation to take title to the "Stemwinder" because it would be to their advantage to have a new corporation organized, irrespective of whether or not the question of tax savings might *123 result from the organization; further, that Mr. Jones intended to go to New York to work out a plan whereby a corporation would be organized to take title to the "Stemwinder." On May 21, 1941, General Motors Sales Corporation wrote the Barge Co., in part, the following letter: "We are willing to charter to you the Diesel tug "Stemwinder," the terms of the charter being identical mutatis-mutandis with the terms of the charter hereto annexed, except in the following respects: "(1) The term of the charter instead of being 66 months shall be 30 days from the… day of May, 1941. "(2) The hire for the charter will be a dollar per day. "(3) We shall have the right to cancel the charter on two days' notice in the event that an executed sale of the boat is made by us within the charter period to Stemwinder, Inc.
"(4) If you will sign the carbon copy of this letter, we will understand that you will have accepted the proposition hereinabove outlined. "Immediately upon delivery to us of a covenant showing proper insurance coverage in the amount of not less than $124,000, we will instruct our agent at Orange, Texas, to turn the boat over to your representative." A carbon copy of *124 the letter was signed by the Barge Co., showing its acceptance of the terms of the charter. After the expiration of the thirty-day period, the charter was renewed for several additional thirty-day periods until title was taken to the "Stemwinder" by Stemwinder, Inc., in October 1941. The financing of "Stemwinder" was accomplished by a loan from Joseph M. Jones of $24,000 (for which he received a note), using $1,000 received by the sale of its capital stock, and giving a mortgage to the General Motors Acceptance Corporation of $100,000 for the balance of the purchase price. Between May and October 1941, Barge Co. paid a charter hire of $4,500 a month to Stemwinder, Inc., for the use of "Stemwinder." In October 1941, Barge Co. entered into a bare-boat charter party with Stemwinder, Inc., for the "Stemwinder" for a period of 66 months at a monthly rental of $4,500 per month. The Barge Co. used "Stemwinder" in its operation of transporting products in bulk. No application for a certificate of necessity and convenience as a common carrier was ever filed by Stemwinder, Inc., or petitioner, with the Interstate Commerce Commission, because they had not had sufficient time to make the sort *125 of analysis they desired to have to determine what area would be the area in which they would want to operate and in the fields where they knew they wanted to operate. The existing holers of certificates were so well entrenched that to secure a certificate would have been accomplished only against tremendous resistence and at great cost. During the year 1941, Stemwinder, Inc., had no employees other than its three officers. It had no business and received no income other than as a result of its charter hire of "Stemwinder" which gross income was in the amount of $32,700. Its net income before deductions for officers' salaries and Federal taxes was $18,411.39. On December 31, 1941, the directors of Stemwinder, Inc., voted to pay its officers as salary "for the period May 17, 1941, the date of the organization of this corporation," to December 31, 1941, amounts as follows: Joseph M. Jones, president, $4,286; Thomas Jordan, vice president, $4,286; and Harry B. Jordan, vice president, $1,428. Other than the problems of broadening the base and strengthening the position of Stemwinder, Inc., its operations were confined to receiving the rentals. During the year 1941, most of Thomas Jordan's *126 time was spent on the affairs of the Barge Co., where he was on call 24 hours a day. His usual office hours for the Barge Co. were from 8:00 o'clock A.M., until 6:00 o'clock P.M. The Barge Co. paid him a salary of $34,333.32 in 1941. He also had some interest in two joint ventures. One involved the purchase of some barges in Pittsburgh and rental and subsequent sale. The other venture was that of trading in cotton futures. During the time "Stemwinder" was under construction, he made "many" trips to Orange, Texas (the place of its construction). During the part of the year that Stemwinder, Inc., was in existence, he served as vice president. He and the other officers of Stemwinder, Inc., from time to time, discussed the possibilities of various activities that the company had under consideration. During the taxable period here in question, Harry Jordan was agent for the Gulf Refining Company, covering an area of about 20 miles around Gadsden, Alabama, where he lived. His tax return for the year 1941 showed a net amount from this business of $11,100. Most of his time was taken up with this business. He was vice president of the Barge Co., serving in an advisory capacity, and received *127 a salary from the company of $10,465 in 1941. Only a small amount of his time was used to transact the business. During the year 1941, he made business trips to Chattanooga, Knoxville, Guntersville, and Mt. Vernon, Indiana. In August 1941, he made a business trip to Cuba. He discussed at various times the problems of Stemwinder, Inc., with the other officers of the corporation. Joseph M. Jones had an active general law practice in 1941 from which he received total receipts of $72,162.91 (included in this amount are salaries of $26,000 received from the Barge Co. and $4,286 from Stemwinder, Inc.) and a net profit of $45,601.45. He was vice president of New Orleans Petroleum Company and a director in a corn products company. He also held some rental property that was turned over to an agent. He handled all legal details in connection with Stemwinder, Inc.'s incorporation. The executive office of Stemwinder, Inc., was a part of his office and the books of the corporation were kept in his office. He carried on all business and legal details in arranging with General Motors Sales Corporation for the purchase of "Stemwinder." These negotiations required three personal trips to New York. *128 On one of the New York trips he went to Washington to confer with officers of the Interstate Commerce Commission concerning the availability of certificates of necessity and convenience. One of the trips to New York was made exclusively for purposes of Stemwinder, Inc., and on two of the trips he was there on other business also. He made one trip to Beaumont, Texas, in an attempt to settle a lawsuit, involving the libel in admiralty of the tug "Stemwinder." This trip was in the interest of both the Barge Co. and Stemwinder, Inc. An attorney from his office made two trips to Beaumont in connection with the documenting of "Stemwinder." Jones made a trip to Gadsden, Alabama, to meet with Harry Jordan to survey different areas and possibilities for the purpose of installing terminals. He had many conversations with one or both of the other officers of Stemwinder, Inc., concerning the problems confronting the corporation. Upon examination of the return, the commissioner disallowed $5,500 as compensation of officers with the following explanation in the notice of deficiency: "It is held that reasonable compensation for the part time services rendered by your officers during the approximate *129 7 1/2 months of the year 1941 following the date of your incorporation, is as follows:" Joseph M. Jones, President
$1,900.00
Thomas Jordan, Vice-President
1,900.00
H. B. Jordan, Vice-President
700.00
Total
$4,500.00
A reasonable allowance for salaries for the services rendered by Joseph M. Jones, Thomas Jordan and Harry B. Jordan, is $2,500, $2,500, and $1,000, respectively. Opinion The petitioner claims that salaries paid to its officers, Joseph M. Jones, Thomas Jordan and Harry B. Jodan, of $4,286, $4,286, and $1,428, respectively, represent reasonable allowances for officers' salaries, while respondent argues that the amounts that should be allowed as a deduction for such salaries should be not more than $1,900, $1,900, and $700, respectively. Section 23 (a) (1) (A) of the Internal Revenue Code[1] provides for a deduction in a taxable year of amounts which represent reasonable compensation for personal services actually rendered. The question before us is what represents reasonable compensation for petitioner's officers for the period of May 17, 1941, to December 31, 1941. *130 The question is one of fact, Transportation Service Associates, Inc., v. Commissioner, 149 Fed. (2d) 354, the answer to be gleaned from a wide range of evidence, both factual and opinion. The usual presumption of correctness attaches to the determination of deficiency by the Commissioner and the petitioner must prove the propriety of larger deductions than determined. Miller Mfg. Co., Inc. v. Commissioner, 149 Fed. (2d) 421; Draper & Co., Inc., 5 T.C. 822. We have examined and weighed all of the evidence, for a proper and reasonable answer to our question. On brief, petitioner uses as basis for argument a variety of activities entered into by its officers, some of which were activities that were engaged in before May 17, 1941, the date of incorporation of Stemwinder, Inc. With few exceptions, there is no attempt to segregate the activities as to those occurring within the period May 17, 1941, and December 31, 1941, and those taking place prior to May 17, 1941. We have considered that though the resolution of December 31, 1941, fixing the officers' salaries does so "for the period from May 17, 1941, the date of the organization of this corporation, *131 " a fair interpretation of the resolution requires inclusion of any services during the formation of the corporation, rendered by the three officers here involved, since the services in general lead directly to, and were a part of, the organization of that corporation which received any benefit accruing from such services. We understand from Camp Wolters Land Co. v. Commissioner, 160 Fed. (2d) 84, that the corporation is "entitled to such deductions as would have been available to it had it been duly and legally incorporated prior to any of the transactions by its incorporators * * *." Lucas v. Ox Fibre Brush Co., 281 U.S. 115. We have, moreover, considered separately the services of each officer herein involved. Lydia E. Pinkham Medicine Co. v. Commissioner, 128 Fed. (2d) 986; Miller Mfg. Co., Inc., v. Commissioner, supra; Transportation Service Associates, Inc., v. Commissioner, supra.The officers were also officers of another corporation, and it has been difficult in various matters to allocate services performed and time devoted among the two corporations, and other personal activities and interest of the men involved. *132 Though the officers are shown to be men of ability and value to the corporation, and that fact must be, and has been, considered, the amount of time spent on the petitioner's affairs is in some instances only indefinitely shown, and that element has also been regarded, though along with the abilities of the men. Thus Joseph M. Jones testified, in response to a question whether he could state what per cent of his time was used in the business of Canal Navigation Company, that he could not answer, could not "divide the time with a degree of accuracy * * *," referring to the two corporations of which he was officer. Though considerable evidence had to do with future plans of Stemwinder, Inc. (which in the taxable year had income only from leasing its boat), and though efforts devoted to such future plans are not eliminated from consideration (though the plans largely did not materialize), the evidence is not greatly convincing as to value of services. In October, 1941, well before the end of the year, the "Stemwinder," the corporation's only asset, had been chartered for 66 months, a fact obviously to be weighed against testimony as to general future plans. As to Joseph M. Jones, the *133 evidence is that some of his services were consideration for his stock in the petitioner corporation, since he testified that for the stock he paid $600, "together with other valuable consideration," which he identified as "the securing of the boat 'Stemwinder' for the corporation." Since the "Stemwinder" was petitioner's only boat and asset during the taxable year, the securing thereof appears as the principal element of valuable services rendered; and since Mr. Jones also valued at $1,000 his services on the trips to New York in connection with Stemwinder, "in the perfection of the charter agreement and taking title to the boat," one of the trips being exclusively for the purposes of Stemwinder, it appears that the larger part of $1,000 should be ascribed to basis for his stock received, rather than in payment of current service in the taxable year. Thomas Jordan spent most of his time on affairs of the other corporation, being on call 24 hours a day, and his usual work for the Barge Co. being from 8:00 o'clock A.M. to 6:00 P.M. He had other interests. It is difficult to find great value in time or service remaining for the petitioner. The services of Harry B. Jordan to the petitioner, *134 and the time involved therein, are not impressive, considering his efforts for other affairs. The services of the three officers covered considerably less than a full year. It was some time in March 1941, when Jones wrote to General Motors Corporation of the idea of a new corporation. We can not place services to petitioner, therefore, any earlier. Since stockholdeings were not proportionate to salaries voted, we have not considered the stockholding element of importance. We have considered the fact that the salaries are a considerable proportion of the corporation's gross income, $32,700. That the directorship determined upon the salaries has been given weight, but is not considered conclusive. L. Schepp Co., 25 B.T.A. 419; Trico Products Corporation, 46 B.T.A. 346. We believe it neither necessary nor helpful to set forth in detail our analysis of the evidence, and our conclusions. After weighing such evidence, we conclude and hold that the deductions taken by the petitioner were reasonable, to the extent of $2,500 each for Joseph M. Jones and Thomas Jordan, and $1,000 for H. B. Jordan. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩