Harry Suffrin, Inc. v. Commissioner.
Harry Suffrin, Inc. v. Commissioner
Docket No. 17203.
United States Tax Court
1949 Tax Ct. Memo LEXIS 187; 8 T.C.M. (CCH) 465; T.C.M. (RIA) 49113; May 12, 1949
*187 Ralph W. Barbier, Esq., Penobscot Bldg., Detroit, Mich., for the petitioner. Philip J. Wolf, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined deficiencies in the income, declared value excess-profits, and excess profits tax liability of petitioner for the taxable years ended January 31, 1945, and January 31, 1946, as follows: Declared
Value
Excess-
Excess
Fiscal Year
Income
Profits
Profits
Ended
Tax
Tax
Tax
January 31, 1945
$2,111.71
$21,516.35
January 31, 1946
$832.95
20,192.28
The Commissioner, having determined $40,000 as reasonable annual compensation for the services of Harry Suffrin, petitioner's president, treasurer and general manager, disallowed sums paid him in excess of that amount as a deduction. Petitioner contests the disallowance. Other adjustments made by the Commissioner in the letter of deficiency were not controverted. The parties filed a stipulation of facts, which we adopt, and from which, together with the oral testimony and exhibits introduced at the hearing, we adduce the following: Findings of Fact The petitioner *188 is a corporation incorporated in 1929, with its office and place of business in Detroit, Michigan, and is engaged in the business of selling men's clothing and furnishings at retail. Its income, declared value excess-profits and excess profits tax returns for the years involved herein were filed with the collector of internal revenue for the district of Michigan at Detroit, Michigan, on the accrual basis and on the basis of a fiscal year ending January 31, as it had always done. Harry Suffrin, hereinafter called Suffrin, has been the president, general manager and a director of petitioner since its inception, and its treasurer from date of incorporation to May 27, 1946. Since 1937 he has owned approximately two-thirds of petitioner's outstanding first preferred stock and all of its outstanding second preferred stock. His wife, Dorice O. Suffrin, has, since 1937, owned the remaining one-third of the first preferred stock. The first and second preferred are nonvoting stocks; the first preferred has voting privilege under certain contingencies which has never been exercised. The voting stock of the petitioner is the no par value common stock, of which, from the date of petitioner's *189 incorporation to February, 1933, Suffrin never owned less than 75 per cent nor more than 80 per cent, from February 1933 to April 1938 he owned approximately 98 per cent, and from April 1938 to May 1946 he owned approximately 83 per cent and his two daughters each owned 7 1/2 per cent thereof. Of this stock 2,000 shares were always outstanding. Another stock on a parity with the no par value common stock is the new "special no par value common stock" authorized since 1938 which can be purchased by only those employees of petitioner who may be chosen by its board of directors, subject to petitioner's right to re-purchase same upon an employee leaving petitioner's service, at its then book value. Outstanding in the taxable years were 230 shares of this stock, all owned by employees having no official position with the corporation. Capitalization: Petitioner's original outstanding capital stock was: First Preferred
1,600 shares
$160,000.00
Second Preferred
1,000 shares
100,000.00
No Par Value Common
2,000 shares
2,000.00
All of the outstanding first perferred stock, plus 400 shares of no par value common stock, was issued to certain clothing manufacturers *190 who paid $16,400 therefor. This was done to assist petitioner with its original financing and to make possible its incorporation. The balance of petitioner's no par value common stock (1,600 shares) was purchased by Suffrin at $1 per share. Upon incorporation petitioner issued 272 shares of its second preferred stock to Kennedy's, a Michigan corporation, (a retail clothing business) in exchange for its assets; 700 of said shares to Suffrin in exchange for the assets of a retail clothing business conducted by him as an individual, and 28 of said shares were purchased by Suffrin at par. Suffrin owned over 90 per cent of the outstanding stock of said Kennedy's. Due to a redemption of a portion of its first and second preferred stock and other changes in its capital structure, petitioner's outstanding capital stock was on the following dates as follows: First
Second
No Par Value
No Par Value
Preferred
Preferred
Common
Special
Dec. 26, 1944
297 shares
10 shares
2,000 shares
230 shares
Dec. 6, 1945
267 shares
10 shares
2,000 shares
230 shares
Jan. 7, 1947
207 shares
10 shares
2,000 shares
230 shares
Directors: The directors of petitioner *191 have been as follows: From March 23, 1929, to April 8, 1930, Suffrin and Henry M. Butzel and Abraham J. Levin, attorneys for petitioner. From April 8, 1930, to May 4, 1934, Suffrin, S. A. Goldberg, attorney for a preferred stockholder, and Abraham J. Levin. [1]
From May 4, 1934, to April 2, 1940, Suffrin, Dorice Suffrin and Abraham J. Levin. [1]
From April 2, 1940, to December 10, 1945, Suffrin, Carl G. Sterr [2] and Abraham J. Levin. [1]
From December 10, 1945, (number of Directors increased to 5) to May 27, 1946, Suffrin, Carl G. Sterr, [2]Abraham J. Levin, [1] Dorice Suffrin and E. Eugene Eicher.[2]
Net Sales: The net sales made by petitioner, by departments, for the fiscal years ended January 31, 1930, through January 31, 1948, are as follows: Fiscal
year
ended
Jan. 31
Clothing
Furnishings
Total
1930
$1,602,252.88
$ 8,986.08
$1,611,238.96
1931
1,175,481.64
66,479.29
1,241,960.93
1932
618,962.99
40,353.83
659,316.82
1933
346,977.06
Had no
346,977.06
1934
435,632.03
furnishings
435,632.03
1935
606,277.63
depart-
606,277.63
1936
651,521.43
ments
651,521.43
1937
796,692.16
during
796,692.16
1938
919,324.97
these
919,324.97
1939
704,731.89
years
704,731.89
1940
797,787.09
33,246.23
841,033.32 *
1941
1,155,755.03
99,203.40
1,254,958.43
1942
1,762,799.48
160,344.64
1,923,144.12
1943
1,917,381.57
196,933.35
2,114,314.92
1944
2,269,201.34
211,870.10
2,481,071.44
1945
2,126,961.27
292,258.74
2,419,220.01
1946
1,948,436.26
362,093.92
2,310,530.18
1947
2,615,957.87
481,707.43
3,097,665.30
1948
4,436,628.99
845,769.10
5,282,398.09
*192 Net Income: The following is a tabulation showing the petitioner's net income, before income and/or excess profits taxes as per its income tax returns as adjusted by various revenue agents' reports, and the Federal income taxes paid by the petitioner for said years: Fiscal
Net Income
years
Before
Federal
ended
Federal
Income
January 31
Taxes
Taxes
1930 $- 8,149.66 $
1931
- 54,920.83
1932
- 102,996.66
1933
- 24,756.79
1934
27,289.12
3,722.69
1935
24,496.07
3,593.01
1936
36,772.74
5,713.72
1937
40,082.51
5,762.35
1938
23,271.43
6,301.70
1939
885.76
110.72
1940
30,812.34
5,903.46
1941
55,363.77
18,433.31
1942
158,641.26
88,785.69
1943
176,810.26
126,499.04
1944
167,055.14
118,929.61
1945
237,419.55
173,166.93
(1946
188,663.35
133,653.57
(1946 From Capital
Gain
Real Estate
209,707.00
52,426.75
Dividends: The dividends paid by petitioner upon its outstanding stock for the fiscal years ended Jan. 31, 1930, through Jan. 31, 1948, are as follows: Fiscal years
Preferred [1]
First
Second
ended Jan. 31
Non-Par
Preferred
Preferred
Common
Total
1930
$11,411.92
$11,411.92
1931
1932
1933
1934
1935
1936
1937
$6,300.00
3,430.00
$16,170.00
25,900.00
1938
1939
1940
1941
1942
1943
$ 9,020.00
$ 9,020.00
1944
$ 3,946.25
$ 122.50
11,150.00
15,218.75
1945
1,197.00
35.00
11,150.00
12,382.00
1946
2,856.00
105.00
15,505.00
18,466.00
*193 Employment Contracts: On March 23, 1929, petitioner made a written contract with Suffrin, the material portion of which is as follows: "SUFFRIN agrees to enter into the employ of COMPANY as general manager of its business, and to devote to its business his entire business time and attention, not being engaged or interested, during the term hereof, in or with any other person, firm or corporation, either by the investment of money, the rendering of personal service, or otherwise, without the written approval of all the stockholders, preferred and common, of COMPANY. "The foregoing, however, shall not prevent SUFFRIN from investing any available surplus funds of his own in the securities or stock of any non-competitive enterprise. "SUFFRIN admits that a breach on his part of the foregoing provision of this contract would cause to COMPANY loss and damage, the amount of which it is impossible to ascertain as his services are unique and cannot be replaced. He therefore agrees that in addition to any and all other remedies which COMPANY may or can have by reason of a breach thereof on his part, COMPANY *194 shall have the right to secure an injunction against his interesting or engaging himself, during the term hereof, in or with any other person, firm or corporation contrary to his covenants herein. "COMPANY agrees to employ SUFFRIN as general manager of its business and to give him, and COMPANY hereby does give him, the power and authority customary for a general manager, but at all times and in all things subject to the supervision and control of the Board of Directors of COMPANY. "COMPANY agrees to pay SUFFRIN, and SUFFRIN agrees to accept as full payment for his services hereunder the sum of Thirty Thousand ($30,000) Dollars a year, payable in equal monthly installments beginning as of February 1st, 1929. "In the event that SUFFRIN is unable or fails to perform his duties hereunder for six months or more, the COMPANY shall have the right to terminate this contract. "The term of this contract shall be ten (10) years from February 1st, 1929." On June 18, 1931, the depression was on, and Suffrin's annual salary was reduced to $20,000, as shown by the board of directors' minutes of that date, viz: "Upon motion made by S. A. Goldberg and seconded by A. J. Levin, the following *195 resolution was unanimously adopted: "WHEREAS, S. Makransky & Sons have offered to modify the agreement dated April 12, 1929, insofar as the same provides that this corporation must order merchandise from S. Makransky & Sons in an amount not less than thirty (30%) per cent of all men's clothing ordered by the corporation from all sources, as is more specifically therein stated, but such modification is not to affect the option to purchase first preferred stock, nor to affect the provisions as to life insurance on the life of Harry Suffrin, said modification to provide, however, for the release of all obligations thereunder with reference to the failure to order merchandise, and likewise a release of Makransky for anything concerning the same subject matter, and "WHEREAS, Harry Suffrin has offered upon the condition of such modification being effected, to reduce his salary to Twenty Thousand ($20,000.00) Dollars per year for the balance of the term of his contract with the corporation, dated March 23, 1929, but such reduction to remain in effect only so long as the redemption and dividends of the first preferred stock is in arrears, "NOW, THEREFORE, BE IT RESOLVED, that the officers *196 are authorized to execute contracts containing the foregoing modification in such form as they deem advisable." In 1934 the continued adverse effects of the depression were such that no dividends had been paid by petitioner for three years. The outside investors, who still held a majority of the preferred stock, were dissatisfied and among other steps to appease them, Suffrin's salary, by mutual consent, was placed on a percentage basis and fixed at 3 per cent of petitioner's net sales, which was an arm's length agreement. Then and in each year thereafter continuously until December 1, 1945, the total compensation paid Suffrin for his services was 3 per cent of petitioner's net sales. The board of directors' minutes for each of the fiscal years from 1938 to 1943, inclusive, show Suffrin's compensation was so fixed, and the minutes of January 21, 1943, show that his compensation would be the same for the subsequent years. On November 27, 1945, but effective December 1, 1945, Suffrin's salary was fixed at 2 1/4 per cent of petitioner's net sales, [1] as shown by the board of directors' minutes of that date. The same minutes approved a contract of employment by petitioner of Albert *197 A. Cook, beginning December 1, 1945, wherein Cook was employed as "supervisor of merchandising activities" and "other service as prescribed by the President and Board of Directors", at an annual salary of $20,000, plus 3/4 of 1 per cent of all net sales of the corporation, excepting annual sales of leased departments in excess of $2,666,666. The minutes show that Suffrin made the motion to reduce his own salary, reciting that "he was willing in view of the additional compensation provisions of the Cook contract that his salary be reduced to 2 1/4 per cent" which was done. The compensation paid Suffrin from December 1, 1945, to January 31, 1946, was 2 1/4 per cent of the net sales of petitioner. Cook was employed to perform some of the duties theretofore performed by Suffrin, principally that in the buying of men's clothing. Suffrin had been working very hard and his doctor had advised him that he must relieve himself of some of his duties. Cook's employment was terminated on March 21, 1946, (56 days after the expiration of the second taxable year here involved) it being discovered that his previous experience as buyer with a department store did not qualify him as buyer for petitioner. *198 Officers of Petitioner: In the taxable years Suffrin was president, treasurer and general manager of petitioner. Due to the work and responsibility assumed by Suffrin, the only other officer of the company during those years was Carl G. Sterr, vice-president, whose duties were less onerous and minor in importance and responsibility to those of Suffrin. Sterr had charge of the maintenance, help and "will-call" department, and had no part in the buying or selling of merchandise. Sterr's salary for the fiscal year ended January 31, 1945, was $12,230.70 ($12,000 plus $230.70 bonus) and $15,500 for the fiscal year ended January 31, 1946. Ratio of Officers' Salaries to Gross Profits: *199 The gross profits, total officers' salaries, Suffrin's salary and ratio of same to gross profits in the taxable years were as follows: Ratio of
Ratio of
Suffrin's
Total
All Officers'
Salary to
Gross
Officers'
Suffrin's
Salaries to
Gross
Year Ended
Profits
Salaries
Salary
Gross Profits
Profits
1/31/1945
$859,589
$84,806
$72,576
.098
.084
1/31/1946
$839,636
$82,279
$66,779
.098
.079
Floor Space of Petitioner: In 1929 it occupied 15,600 square feet; in 1937, 4,000 square feet were added; in 1939, 8,000 additional, and in 1945 an additional 10,000 square feet, making a total space occupied in 1945, 37,600 square feet. Of this total 8,000 square feet was occupied by the so-called leased departments, operated by others on a rental basis. Employees: The number of petitioner's employees by years is as follows: Calendar
Minimum
Maximum
Year
Number
Number
1940
102
135
1941
118
190
1942
111
196
1943
137
158
1944
113
155
1945
121
150
1946
105
170
The aggregate of all salaries paid to its employees by petitioner, other than officers, in the year ended January 31, 1945, was *200 $339,374.77, and in the year ended January 31, 1946, $359,507.96. Suffrin's Services: Suffrin, aged 56 (in last taxable year) has been in retail men's clothing business all of his life. He worked in his father's clothing store in Chicago, beginning in his teens. In 1920 he moved to Detroit and opened a store of his own at the present site of petitioner's business, where he has since been continuously engaged, either as an individual or the head of a corporation. He had exceptional ability and possessed special qualifications as executive head and manager of petitioner's business, due to his training, experience and aptitude therefor. He was skilled in the buying and selling of men's clothing and furnishings, planned each season's purchases in advance, had a knack of selecting the styles and color schemes which would appeal to the buying public. The duties performed by him as president, treasurer and general manager were those usually incident to such positions and the entire business was under his personal direction, supervision and control and he devoted his entire time thereto and engaged in no other business. During the taxable years he took no vacation except an occasional weekend *201 trip to northern Michigan. He was always in the store during business hours, except when away on buying trips. After closing hours and at night he frequently worked on petitioner's advertising and budgeting of figures for the purchase of merchandise. In the retail clothing business a "merchandiser" is one who plans, supervises and directs the buying and selling of merchandise. A "buyer" is one who executes the orders of the merchandiser by actually dealing with the manufacturer to secure the quantity and style of merchandise at the price determined upon by the merchandiser. During most of the taxable years Suffrin was both the merchandiser and buyer for petitioner of all men's clothing, and was also the merchandiser for the furnishings and hat departments. Emil Shellfish was the assistant buyer and was exclusive buyer in the furnishings department. Of the sales approximately 80 per cent was men's clothing and 20 per cent furnishings. In the taxable years it was difficult for retailers to buy men's clothing in quantities since many clothing manufacturers were still devoted to the making of uniforms and some had not been reconverted from war industries. Due to Suffrin's long years *202 in the business and the contacts and personal relations he had formed throughout the years he had less difficulty in buying clothing than the average retailer. While the shortage of men's clothing generally doubtless augmented the volume of petitioner's sales, Suffrin's duties and responsibilities were correspondingly increased thereby. Advertising: Petitioner's sales in the taxable years were augmented by a large amount of effective advertising. Advertising had always been one of Suffrin's hobbies, in which he was well versed, and in the taxable years he acted as "director of advertising" for petitioner, writing much of the copy therefor. Amounts expended by petitioner for newspaper and other advertising were as follows: Fiscal Year
Ended
Newspaper
Total
January 31, 1942
$70,317.74
$100,059.88
January 31, 1943
86,637.37
113,239.98
January 31, 1944
91,866.58
117,067.25
January 31, 1945
74,079.20
115,826.61
January 31, 1946
77,765.86
123,737.13 Since 1940 petitioner has been the leading "Men's Clothing Store" advertiser in Detroit. The linage used by petitioner in the three leading Detroit newspapers was: Total
Year
Linage
1937
148,030
1938
119,476
1939
128,387
1940
174,979
1941
198,024
1942
214,705
1943
268,780
1944
175,525
1945
178,946
1946
214,017
*203 In May, 1946, (after taxable years) petitioner employed an advertising manager at an annual salary of $15,000 plus bonus. He handles the mechanical details of the advertising, but Suffrin has continued his active supervision of the advertising and writing much of the copy. Prior to the war the mortality rate in the men's clothing business was in excess of 90 per cent, but during the war and shortly thereafter, such mortality rate was very low. The ability and personal service of Suffrin contributed materially to the success of petitioner's business, and its growth and success are primarily attributable thereto. Compensation Paid Suffrin: The total annual compensation paid by petitioner to Suffrin was as follows: Fiscal
Fiscal
Year
Year
Ended
Ended
Jan.
Jan.
31
Salary
31
Salary
1930
$30,000.00
1939
$21,127.48
1931
30,000.00
1940 [1]
27,988.42
1932
23,333.35
1941
37,648.76
1933
21,666.68
1942
57,665.97
1934
13,253.45
1943
55,090.81
1935
18,076.94
1944
74,426.32
1936
19,556.38
1945
72,576.59
1937
23,914.02
1946
66,779.28
1938
27,902.00
*204 Prior to the taxable years here involved petitioner in each of said years claimed deduction in the amounts as above listed for the salary it paid suffrin. *
For the fiscal year ended January 31, 1945, petitioner claimed as a deduction for salary paid Suffrin for his services the sum of $72,576.59, being 3 per cent of petitioner's net sales for that year, and the Commissioner determined same to be excessive in the sum of $32,576.59, and that $40,000 was reasonable compensation. For the year ended January 31, 1946, petitioner claimed as deduction for salary paid Suffrin the sum of $66,779.28 (being 3 per cent of petitioner's net sales from January 31, 1945, to December 1, 1945, and 2 1/4 per cent from December 1, 1945, to January 31, 1946), and the Commissioner determined same to be excessive in the amount of $26,779.28, and that $40,000 was reasonable compensation. Reasonable compensation for the services actually performed by Suffrin for petitioner for the fiscal year ended January 31, 1945, was the sum of $72,576.59 and for the year ended January 31, 1946, the sum of $66,779.28. Opinion The question *205 of what amount is reasonable for income tax purposes under section 23 (a) (1) (A), I.R.C. for a corporation to pay its principal officer and executive head as compensation for his services is usually difficult to determine. There is no fixed yardstick and each case must stand upon its own peculiar facts, and in determining whether compensation is reasonable, the situation must be considered as a whole. The history of petitioner corporation, from its inception, up to and including the taxable years, is built around Suffrin. He was its founder, and its growth and success is attributable primarily to his personal services, business acumen and also to his special qualification as executive head and manager of such a business, acquired by early training, years of successful experience and aptitude therefor. In the taxable years petitioner was a close corporation, Suffrin and his immediate family owning nearly all of its stock, but when it was first organized in 1929, and for some years thereafter, slightly more than one-half of the capital invested therein was owned by clothing manufacturers. Suffrin then, and for some years prior thereto, was engaged in the retail *206 clothing business on a small scale and the investment by the clothing manufacturers of $160,000 made possible the expansion of the business by the creation of petitioner corporation. A desire to increase their sales doubtless motivated these manufacturers in making this investment, but in so doing they paid tribute to Suffrin's ability as a retail clothing executive. Their recognition of his special fitness therefor is further evidenced in the contract of employment between petitioner and Suffrin as general manager, wherein Suffrin is obligated for a ten year period to devote his "entire business time and attention" to its business and not to render any personal service or otherwise to any other business without the written consent of petitioner, and it is provided that a breach of the contract in this regard "would cause the Company loss and damage, the amount of which is impossible to ascertain as his services are unique and cannot be replaced" and to prevent such breach the company is given the right of court injunction. While the statement that his services "cannot be replaced" was doubtless an exaggeration since we know from human experience that the irreplaceable man does *207 not exist, the record which Suffrin subsequently made in steering a business of this kind through the depression when 90 per cent of those similarly engaged were failing and petitioner's success on the whole is evidence of his exceptional ability. The gradual growth and expansion of the business in volume, net sales and profits are fully detailed in our findings of fact, as is Suffrin's application and long hours devoted to the business. These and the enumeration of the various important duties performed by him also contained therein we deem unnecessary here to repeat. Suffice it to say that his know-how in the purchase and sale of men's clothing, his ability to purchase same in large quantities when many retailers were unable to do so, his selection of styles and planning in advance therefor, together with his skill and knowledge in advertising and executive ability all contributed very materially to the success of the business. Under the record as a whole were the payments to Suffrin for his services of 3 per cent of the net sales for the fiscal year ended January 31, 1945, and for the fiscal year ended January 31, 1946, 3 per cent of the net sales up to December 1, 1945, and *208 2 1/4 per cent of the net sales from then to January 31, 1946, reasonable compensation? We think so. We think petitioner's evidence is sufficient to overcome respondent's adverse determination. It is true that in the taxable years petitioner was a close corporation and hence the evidence is subject to special scrutiny. C. S. Ferry & Son, 18 B.T.A. 1261; L. Schepp Company, 25 B.T.A. 419. It must be remembered, however, that the method and formula of basing Suffrin's compensation at 3 per cent of net sales was established more than ten years prior to the taxable years, when the clothing manufacturers owned a controlling interest in the stock, and the fixing of Suffrin's salary on that basis was an arm's length agreement which had remained in force and effect continuously until December 1, 1945. On that date Albert A. Cook was employed by petitioner to perform some of the duties theretofore performed by Suffrin, and Suffrin's salary, upon his own motion, was reduced from 3 per cent to 2 1/4 per cent of the net sales, indicating a reasonable attitude. Suffrin's doctor had advised him to relieve himself of some of the duties he was then performing. In the *209 taxable years Suffrin was both president and treasurer, also general manager, and, with the exception of a vice president whose duties, responsibilities and salary were not comparable to those of Suffrin's, was the only officer of the company. The Suffrin salary comprised approximately 80 per cent of all officers' salaries paid by petitioner and is relatively not excessive in proportion to petitioner's gross profits, the ratio thereto being about 8 per cent. For each of the three fiscal years immediately preceding the taxable years here involved petitioner paid Suffrin a salary largely in excess of $40,000, which sum respondent has here determined to be reasonable, and petitioner in each of said preceding years claimed deduction for the salary so paid. For the fiscal year ended January 31, 1944, just preceding the taxable years involved, petitioner claimed deduction of $74,426.32 for salary paid Suffrin (a sum in excess of the salary paid in each of the taxable years involved). *
The record here refutes the suggestion that the amounts paid Suffrin as salary were in the nature of a distribution of dividends. *210 The history of the establishment of the 3 per cent salary formula shows that it was done to help rather than to prevent the payment of dividends. Furthermore, in the taxable years dividends were declared and paid by petitioner. While the compensation paid Suffrin amounted to a large sum in each of the taxable years, it was based wholly upon a contingent basis, and the employee serving upon such basis takes a risk which one serving for a fixed salary does not. Furthermore, many years prior to the taxable years here involved, petitioner and Suffrin, in an arm's length agreement, established a formula by which to measure Suffrin's compensation. The compensation paid Suffrin in the taxable years before us was measured by that formula, which has been consistently followed since its establishment. The amount of the compensation so paid appears to us to be reasonable under all the facts and circumstances, and we so hold. Respondent's determination that the compensation paid Suffrin was unreasonable is reversed. Since other adjustments made by respondent are not controverted. Decision will be entered under Rule 50. Footnotes
1. Attorney for petitioner.↩
2. Employee of petitioner.↩
*. Sales in the year ended January 31, 1940, were affected by a fire which forced suspension of operations from July 22 to October 9.↩
1. Copied from Stipulation of Facts. No further explanation in the record.↩
1. Net Sales, as used in computing Suffrin's salary, both on the 3 per cent and the 2 1/4 per cent basis was interpreted by petitioner and Suffrin to mean: "the gross sales of all merchandise sold at retail from the store operated by petitioner less refunds made to customers; less credits received resulting from claims for loss or damage to merchandise in transit; sales and excise taxes billed or charged to customers, and charges for alterations, tailoring or repairs shall not be included in net sales."↩
1. During the fiscal year ended 1/31/40 petitioner's business was closed 2 1/2 months due to a fire. Petitioner and the insurance company agreed upon an estimated figure to represent sales during that period, and Suffrin's compensation for such period was based upon the same estimate.↩
*. This paragraph is as amended by Tax Court order dated June 22, 1949.↩
*. This paragraph is as amended by Tax Court order dated June 22, 1949.↩