Thomas E. Scofield v. Commissioner.
Scofield v. Commissioner
Docket No. 26846.
United States Tax Court
1954 Tax Ct. Memo LEXIS 259; 13 T.C.M. (CCH) 338; T.C.M. (RIA) 54096; March 31, 1954
*259 Upon the facts, held, that parts of the deficiencies for the taxable years are due to fraud with intent to evade tax. John A. Ross, Esq., for the petitioner. Everett E. Smith, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies in income tax for the years 1940 through 1947, inclusive, and he has made 50 per cent additions to the deficiencies under section 293(b), I.R.C. Also, he has added the penalty of 6 per cent to the tax for 1946 and 1947, under section 294(d)(2). The determinations originally made by the respondent were as follows: Penalty -
Tax
Penalty -
Sec.
Year
Deficiency
Sec. 293(b)
294(d)(2)
1940
$ 8,109.46
$4,057.76
1941
8,750.74
4,439.62
1942
15,386.21
7,693.11
1943
6,322.67
4,062.88
1944
12,692.85
6,144.98
1945
10,987.65
1,530.87
1946
10,290.01
5,145.01
$571.98
1947
14,744.77
7,372.39
859.59
The respondent has stipulated that certain adjustments will reduce the deficiencies in income tax and the amounts of the penalties. He now asserts that the deficiencies in income tax are as *260 follows: Year
Tax Deficiency
1940
$ 6,912.36
1941
7,401.76
1942
13,315.75
1943
4,721.74
1944
12,048.18
1945
10,488.81
1946
8,706.59
1947
12,802.92
The parties have stipulated that the amounts of the penalties under section 294(d)(2) for the years 1946 and 1947 are $476.92 and $653.26, respectively. The petitioner agrees that his taxable net income for each of the years involved is greater than was reported in his returns, and he has entered into a stipulation with the respondent as to the correct amount of his taxable net income for each year. The chief issue is whether the petitioner filed false or fraudulent income tax returns for each of the years 1940-1947, inclusive, with intent to evade tax. The issue relates solely to the income of petitioner which he realized in each taxable year from the conduct of his profession. The decision of the chief issue will determine whether the deficiencies for 1940 and 1941 are barred by the statute of limitations, and whether section 6 of the Current Tax Payment Act of 1943 is applicable to the computation of the tax for 1942 and 1943. Recomputations under Rule 50 are necessary in view of stipulations *261 relating to payments and credits of tax, and uncontested adjustments. Findings of Fact The facts which have been stipulated are incorporated herein by this reference. The petitioner is a resident of Kansas City, Kansas. His office is located in Kansas City, Missouri. He is a lawyer. His returns for the taxable years were filed with the collector for the district of Kansas. The petitioner has been engaged in the practice of law since 1917. He has maintained his office in Kansas City since 1923, and at all times he has practiced law as an individual. He has specialized in the law of patents, trademarks, and copyrights. During the taxable years, the petitioner employed in his office a junior attorney, one secretary, and one typist. His law practice required frequent trips away from Kansas City during each of the taxable years. During the taxable years petitioner's family consisted of his wife, one daughter, and two sons. During each of the taxable years petitioner received income from dividends, interest, rents, and capital gains. He correctly reported in his returns all of his income from dividends, interest, and rents in each of the taxable years. He reported all of his *262 transactions resulting in either capital gains or losses, and the gain or loss was reported substantially correct. Some adjustments were made by the Commissioner in the treatment of capital gains or capital losses in some of his returns, to which petitioner agreed upon audits which were made before the Commissioner's investigations which resulted in the issuance of the notice of deficiency which gave rise to this proceeding. The issue presented does not relate to petitioner's income during the taxable years from dividends, interest, rents, and capital gains. In his income tax return for 1940, the petitioner reported, inter alia, gross income from his profession in the amount of $15,750; a net loss from the conduct of his profession in the amount of $2,254; and net income from all sources in the amount of $6,861.06. The amount of income tax reported in the return for 1940 was $141.84. During 1940 the petitioner received payments from about 117 clients. His gross receipts and net income from his profession amounted to $62,296.47, and $25,902.21, respectively; and his net income from all sources amounted to $35,017.36. The correct amount of income tax for 1940, exclusive of penalties, *263 is $7,060.26. The petitioner understated in his 1940 return, professional net income and all net income to the extent of $28,156.21 and $28,156.30, respectively. In his return for 1941, the petitioner reported, inter alia gross and net income from his profession in the amounts of $14,955, and $915.98; he reported net income from all sources in the amount of $7,700.91, and income tax due in the amount of $609.33. During 1941 the petitioner received payments from about 100 clients. His gross and net professional income for 1941 amounted to $53,543.78, and $21,312.62; his net income from all sources was $27,121.22, and the income tax due was $8,011.09. In his return for 1941, net professional income and all net income were understated to the extent of $20,396.64 and $19,420.31, respectively. In petitioner's return for 1942, the gross and net professional income reported was $20,681.48 and $8,334.80. No net income was reported. The income tax reported was zero. In 1942, petitioner received payments from about 87 clients. His gross and net professional income amounted to $54,586.39 and $27,106.16, respectively, and net income from all sources was $32,697.55. In petitioner's return *264 for 1942 professional net income was understated to the extent of $18,771.36; and all net income was understated to the extent of $32,697.55. In the return for 1943, petitioner's gross and net income from his profession was reported as $18,100 and $4,148.49, respectively; and his net income from all sources was reported as $6,779.89. The income tax which was reported due was $1,373.10. The amount of gross receipts from petitioner's profession which was reported in his return for 1943 represented fees from seven clients in the aggregate amount of $18,100. During 1943, petitioner received payments from more than 90 clients. The amounts of his gross and net professional receipts were $43,684.38 and $17,735.61, respectively; and his net income from all sources was $22,071.62. The correct amount of income tax upon petitioner's net income of 1942 and 1943 combined under the provisions of the Current Tax Payment Act of 1943 is $21,213.68, exclusive of penalties, before allowing the 75 per cent forgiveness of tax under section 6. In his return for 1943, petitioner's net professional income and his net income from all sources were understated to the extent of $13,587.12 and $15,291.73, *265 respectively. In petitioner's return for 1944, gross and net professional income were reported in the amounts of $14,785 and $1,153.63, respectively; net income from all sources was reported as $5,489.33; and the amount of income tax due was stated to be $987.44. In 1944, petitioner received payments from about 107 clients. He received gross and net professional income in the amounts of $58,740.78 and $25,318.33, respectively, and net income from all sources in the amount of $28,688.82. The income tax due for 1944, exclusive of penalties, amounted to $12,632.73. In his return for 1944, petitioner's professional net income and net income from all sources were understated in the amounts of $24,164.70 and $23,199.49, respectively. The amounts of gross and net income reported in petitioner's return for 1945 were $23,970 and $9,455.34, respectively; net income from all sources was reported as $32,939.60; and the tax due was stated to be $15,718.92. However, petitioner was allowed overassessment and refund of $7,920.01 for 1945 upon an audit of the return for 1945 by an agent of respondent, which was before the investigations which resulted in the issuance of the notice of deficiency *266 which gave rise to this proceeding. During 1945, petitioner received payments from about 140 clients. His gross and net professional income amounted to $56,531 and $25,525.72, respectively. Net income from all sources amounted to $36,708.58, and the tax, exclusive of penalties, is $10,488.81. Professional net income and net income from all sources were understated in the 1945 return to the extent of $16,070.38 and $3,768.98, respectively. In his return for 1946, the amounts of gross and net professional income reported were $22,474.74 and $6,898.58, respectively. Net income from all sources was reported as $16,319.06. The tax due was stated to be $4,859.21. The amount of gross professional income reported, $22,474.74, represented fees from nine clients. During 1946, petitioner received payments from 197 clients. The amounts of gross and net professional income for 1946 amounted to $61,670 and $25,261.58, respectively. Net income from all sources amounted to $36,052.28. The tax for 1946, exclusive of penalties, is $15,674.52. Petitioner's net professional income and his net income from all sources was understated in his return to the extent of $18,363 and $19,733.22, respectively. *267 In his return for 1947, the amount of gross professional income reported was $21,011.87; a net loss from profession was reported in the amount of $5,548.38. Net income from all sources was stated to be $2,283.13. The tax due was reported as $338.80. During 1947, petitioner received payments from about 202 clients. The amounts of gross and net professional income were $73,874.67 and $23,743.38, respectively, and net income from all sources was $31,489.34. The tax, exclusive of penalties, for 1947 is $13,141.72. Net professional income and net income from all sources were understated in petitioner's 1947 return to the extent of $29,291.76 and $26,206.21, respectively. The following tables summarize the above facts: Gross
Professional
Actual
Income
Gross
Reported
Professional
Year
in Returns
Receipts
1940
$ 15,750.00
$ 62,296.47
1941
14,955.00
53,543.78
1942
20,681.48
54,586.39
1943
18,100.00
43,684.38
1944
14,785.00
58,740.78
1945
23,970.00
56,531.00
1946
22,474.74
61,670.20
1947
21,011.87
73,874.67
Total
$151,728.09
$464,927.67
Net
Professional
Actual
Net
Income
Net
Professional
Reported
Professional
Income
Year
in Returns
Income
Understated
1940
[2,254.00)
$ 25,902.21
$ 28,156.21
1941
915.98
21,312.62
20,396.64
1942
8,334.80
27,106.16
18,771.36
1943
4,148.49
17,735.61
13,587.12
1944
1,153.63
25,318.33
24,164.70
1945
9,455.34
25,525.72
16,070.38
1946
6,898.58
25,261.58
18,363.00
1947
(5,548.38)
23,743.38
29,291.76
Total
$23,104.44
$191,905.61
$168,801.17
*268 Net Income
All Sources
Actual
Net Income
Reported
Net Income
All Sources
Year
in Returns
All Sources
Understated
1940
$ 6,861.06
$ 35,017.36
$ 28,156.30
1941
7,700.91
27,121.22
19,420.31
1942
None
32,697.55
32,697.55
1943
6,779.89
22,071.62
15,291.73
1944
5,489.33
28,688.82
23,199.49
1945
32,939.60
36,708.58
3,768.98
1946
16,319.06
36,052.28
19,733.22
1947
2,283.13
31,489.34
26,206.21
Total
$78,372.98
$249,846.77
$168,473.79
Number of Clients Making Payments
1940
117
1941
100
1942
87
1943
90
1944
107
1945
140
1946
197
1947
202
Income Tax
Reported
Correct
Due in
Tax
Tax
Year
Returns [1]
Stipulated
Deficiencies
1940
$ 141.84
$ 7,060.26
$ 6,912.36
1941
609.32
8,011.09
7,401.76
1942
0
13,315.75
1943
1,373.10
21,213.68 *
4,721.74
1944
987.44
12,632.73
12,048.18
1945
15,718.92 **
18,281.82
10,488.81
1946
4,859.21
15,674.52
8,706.59
1947
338.80
13,141.72
12,802.92
*269 The petitioner's returns for the years involved disclosed net short term, and net long term gain or loss from the sale of capital assets, and income from dividends, interest, and rents as follows: 50% of net
Long Term
Net
Net
gain or loss
Dividends
Short Term
Long Term
taken into
interest,
Year
gain or loss
gain or loss
account
and rents
1940
$2,439.37
$ 9,424.58
1941
776.94
[ 7,125.36)
[ 3,562.68)
11,100.07
1942
(45,187.89)
(22,593.94)
8,294.20
1943
2,215.28
1,107.64
6,034.45
1944
2,240.00
1,120.00
5,500.00
1945
24,088.90
12,044.45
14,248.29
1946
10,322.87
5,161.44
10,135.24
1947
( 5,121.32)
( 2,560.66)
10,024.21
In addition, the petitioner reported a net loss from the sale of property, other than capital assets, of $314.11 for the year 1940. As disclosed by the above schedule, the petitioner, during the years 1940 to 1947, inclusive, realized capital gains aggregating $42,083.36, and sustained capital losses aggregating $57,748.68, resulting in a net loss to him of $15,665.32 from the sale of capital assets. In his return for 1942, the petitioner deducted $22,593.94, 50 *270 per cent of long term capital loss from the income which was reported. Since the income reported was less than the amount of the capital loss deducted, no income was reported for 1942. The petitioner's returns for 1942 to 1945, inclusive, were examined by a revenue agent in 1948, prior to the investigation by respondent's agents in 1949 which resulted in the deficiencies and additions to the tax involved herein. The agent making the 1948 audit disallowed $21,593.94 of the amount of the capital loss, $22,593.94, deducted by the petitioner in 1942 from other income. That is, the agent limited the amount of the capital loss deductible in 1942 from other income to $1,000, and treated the amount disallowed, $21,593.94, as a capital loss carry-over which was proper and which was agreed to by the petitioner. This adjustment, resulting in the capital loss carry-over from 1942, affected the computation of petitioner's taxable net income for years subsequent to 1942. As a result of the 1948 audit, the petitioner paid a deficiency of $1,803.09 for 1943, and received overassessments of $486.96, and $7,920.01 for 1944 and 1945, respectively. During 1940 through 1947, and before 1940, petitioner *271 maintained three separate checking accounts for distinct and different uses. The main checking account was in the Union National Bank in Kansas City, Missouri. He deposited in this account all receipts from his profession. Deposits in this account from sources other than petitioner's law practice were insignificant and could be identified. All other receipts unrelated to his professional work, such as dividends and earnings of investments, were deposited in savings accounts. Petitioner maintained a second checking account at the Commerce Trust Company in Kansas City, Missouri which was used solely for his professional needs. The system which was uniformally followed was that periodically amounts would be drawn out of the account at the Union National Bank, to be used for all disbursements made for professional and office matters, which were deposited in the checking account at the Commerce Trust Company; and checks to cover all office and professional disbursements were drawn upon the Commerce Trust Company checking account. There was a third checking account in some bank (not identified) which was used for all personal disbursements. The sums which were deposited in the personal checking *272 account were also drawn out of the depository account at the Union National Bank. Petitioner retained, during all of the years 1940 through 1947, duplicate bank deposit slips for the checking accounts, cancelled checks, bank statements, and the check books (containing check stubs) which showed all checks drawn on the various accounts. During the period in question, petitioner also had three personal savings accounts, one in the Union National Bank, one in the Commerce Trust Company, and one in the First National Bank, all in Kansas City, Missouri. Only the petitioner could draw checks on the main checking account in the Union National Bank. All of the bank statements for this account were received by the petitioner. Petitioner authorized his secretary to sign checks drawn on the business account in the Commerce Trust Company. Another aspect of the banking system of the petitioner was that the deposit slips for deposits in the main checking account in the Union National Bank were made out in duplicate and on the retained copy of each bank deposit slip notation was made of the name or names of the client or clients from whom petitioner received payments of money together with the *273 amounts of the payments. The sources of all deposits in the Union National Bank could be ascertained from the duplicate copies of the bank deposit slips. Also, all of the disbursements made in the operation of petitioner's law practice could be ascertained from the cancelled checks drawn on the checking account in the Commerce Trust Company. From the bank deposit slips of the two business bank accounts in the Union National Bank and the Commerce Trust Company, and from check stubs and cancelled checks, there could be determined for each year the amounts of all of the business and professional receipts and the sources thereof; the amounts of all of the business and professional disbursements; and the amounts of petitioner's withdrawals for his personal uses. At all times material, petitioner kept an office diary in which he personally recorded the number of hours which he devoted to the work for his respective clients. The petitioner, of course, determined the rates and amounts of his fees and retainers. At the end of each month, petitioner gave his secretary the amounts of his charges for professional services and she sent bills to clients every month in accordance therewith. *274 Included in bills for services to clients was the charge for the work of petitioner's junior attorney, employed by him, if any. In petitioner's patent practice, he has a great many patent searches made for clients in the United States Patent Offices. A search is made in from ten days to two weeks. The Patent Office's fee for making the search is twenty-five dollars. The fee for making the search is charged to a client. Clients either paid petitioner the search fee in advance, or petitioner paid the fee and billed the client for the fee. In addition to the patent search fees, there were other costs, in addition to petitioner's fees for his services, connected with petitioner's work for clients. In many instances, petitioner paid such costs as they were incurred. Clients were billed for costs as well as for fees and they reimbursed petitioner for such expenditures. In other instances, clients deposited funds with petitioner to cover the incidental costs. There were costs in handling litigation for clients for photostats, draftsmen's drawings, Patent Office files on histories of patents, among other usual costs. Records were kept in petitioner's office of the incidental costs of handling *275 matters for clients. Cancelled checks showed payments of such costs. The accounting or bookkeeping records which were maintained in petitioner's office were started in 1923 when petitioner opened his office in Kansas City. The method of keeping petitioner's books was in many respects like a single entry system attempting to follow the cash receipts and disbursements method, but it was conglomerated. Petitioner's accounting records were not kept in accordance with any standard system of accounting. There were little books, day books (journals), for all of the taxable years. There were also ledgers in which there were the names of individual clients, and entries showing bills sent to clients and payments of clients. Entries in the day books contained full descriptions of the nature of items, and they were supported by cancelled checks. The entries in the day books itemized all items. Petitioner's secretaries made the entries in his accounting books. Petitioner did not make entries in his accounting books. Petitioner's accounting records did not include a cash journal and a general ledger. It did not constitute a double entry set of books. The account books for petitioner's professional *276 business were not closed (were never closed) each year in the customary way. Nevertheless, from all of the records in petitioner's office - from ledgers showing amounts billed to clients, amounts paid by clients, bank deposit slips and cancelled checks - petitioner's gross and net professional income each year could be ascertained for the purpose of making proper income tax returns. Petitioner employed E. D. Eugster to prepare his income tax returns for the years 1940 through 1945, inclusive, and for earlier years. Eugster was an accountant but he did not set up or lay out the plan of keeping books which was followed in petitioner's office. Petitioner did not employ Eugster to audit his bookkeeping records and Eugster never made an audit of petitioner's books for his professional business. Petitioner regarded Eugster as a friend. Eugster died in 1946 or the early part of 1947. Petitioner then asked Arthur L. Ross to prepare his income tax returns, and Ross prepared his returns for 1946 and 1947. Petitioner did not ask Ross to audit his books for the purpose of preparing his returns or for any other purpose, and Ross did not audit petitioner's books in 1947, or at any time before *277 the investigation of the Commissioner's agents in 1949 which resulted in the determinations which gave rise to this proceeding. The petitioner kept his own personal record of his receipts from his personal investments which included dividends, interest, and gains and losses from sales of securities. He gave his secretary the figures for his income from his investments for inclusion in his income tax returns. After the Commissioner's agents started a special investigation in 1949, petitioner employed Ross to make an audit of his books. Ross found that so much time would be required to ascertain accurately from petitioner's bookkeeping records for the years 1940 through 1947 (which were not then complete, pages of ledgers for certain years being missing), his annual professional income and expenditures with adjustments for reimbursable clients' expenses, that he (Ross) agreed with the computations of petitioner's annual gross professional income which the special agents of the Commissioner made in the course of their examination. Ross located additional items of expense in the course of his audits, upon examining bookkeeping records which had not been located when the special agents *278 made their investigation and computations, and the Commissioner's agents agreed to increase the amounts of expenses by various amounts for each of the taxable years. Ross, in making his audit in 1949, had a clients' ledger of petitioner which was complete for 1947, a clients' ledger for 1946 which was not complete, and clients' ledgers for 1945, 1944, and 1941 which may not have been complete. Clients' ledgers for 1940, 1942, and 1943 were missing. Ross had day books for the years 1940 through 1947. In making his audit, Ross had to reconstruct clients' ledgers from the day books for each year, duplicate deposit slips, cancelled checks and check stubs. When the Commissioner's special agents, in 1949, made their investigation of petitioner's income for the years 1940 through 1947 they obtained the data from petitioner's office which showed that the gross professional income which was reported in petitioner's income tax returns for 1943 and 1946 represented payments from only seven and nine clients, respectively. Also, they obtained from petitioner's office all of the duplicate bank deposit slips for all of the years 1940 through 1947. The Commissioner's special agents, in their *279 audit of petitioner's income for the years 1940-1947 reconstructed his gross and net professional income from bank deposits. This was necessary because in 1949 all of petitioner's accounting records were not complete; some were missing, which were never found; and some were missing or were not available at the time the agents were making their investigation. The agents computed petitioner's gross professional income for each year and his net professional income from bank deposit slips and bank withdrawals shown by cancelled checks. All receipts from clients were included in gross professional income, including clients' reimbursements and payments of the costs of their work in addition to fees for services. Clients' costs and expenses, as far as the agents could ascertain them, were included in the expenses of petitioner's professional business. The agents eliminated from gross receipts, items which clearly were not income. Under all of the circumstances, the computation of petitioner's gross and net professional income for the years 1940-1947, by the Commissioner's agents, from bank deposits and bank withdrawals was a valid method of procedure. The following schedule shows, for *280 each of the taxable years, petitioner's gross receipts from his profession, clients' expenses, all expenses including clients' expenses, and professional net income: All Expenses
Gross Busi-
Clients'
Including
Business
Year
ness Receipts
Expenses
Clients'
Net Income
1940
$62,296.47
$16,388.33
$36,394.26
$25,902.21
1941
53,543.78
16,333.22
32,231.16
21,312.62
1942
54,586.39
12,760.91
27,480.23
27,106.16
1943
43,684.38
10,809.96
25,948.77
17,735.61
1944
58,740.78
15,455.79
33,422.45
25,318.33
1945
56,531.00
15,709.39
31,005.28
25,525.72
1946
61,670.20
17,345.73
36,408.62
25,261.58
1947
73,874.67
21,166.15
50,131.29
23,743.38
The summary of the clients' ledger for 1947, Exhibit II, shows that most of petitioner's clients made payments during 1947 of the charges billed to them during 1947; some clients made payments in 1947 which were billed before 1947; and only a few clients did not pay in 1947 the charges billed to them during 1947. Exhibit II is incorporated herein by this reference. During the war years petitioner's law practice involved practically no litigation. Therefore, petitioner was not concerned *281 during the war years with clients' litigation expenses and costs. During the period 1940-1947, petitioner employed different secretaries, one of whom was in his office from 1943 until September of 1951. All of petitioner's returns were prepared on a cash basis for a calendar year. Petitioner signed each of his income tax returns for the years 1940-1947, inclusive. Petitioner subscribed and affirmed before a notary public that he had examined the returns for 1940 and 1941 and that to the best of his knowledge and belief the returns were true, correct, and complete, and that they were made in good faith. With respect to his returns for the years 1942-1947, inclusive, petitioner subscribed to the returns, under penalties of perjury as ones which he had examined and found to be, to the best of his knowledge and belief, true, correct, and complete, and as ones which were made in good faith. Petitioner made payments on his estimated tax for 1946 as follows: $1,075 on February 25, 1946; $1,075 on June 5, 1946; $1,075 on August 30, 1946; and $4,500 on January 15, 1947, - total $7,725. His tax liability as disclosed by his return for 1946 was $6,967.93, and reported overpayments on *282 the estimated tax were in the sum of $757.07. Petitioner filed an amended return for 1946 reporting tax in the amount of $4,859.21, against which were the payments on estimated tax totaling $7,725, and overpayments of $2,865.79 for 1946 instead of the sum of $757.07 stated in the original return. The difference between these "overpayments" is $2,108.72. The parties have stipulated that a credit carry-over in the amount of $2,108.72 has not been allowed to petitioner by the collector. During the years 1940-1947, petitioner, from time to time, made gifts to members of his family. In 1943, he gave between $40,000 and $50,000 in securities to his wife. He made gifts of a value of $3,000 to each of his children in some years. In 1941, petitioner bought a small boat, 40 feet long, operated by himself, for $5,000. During the period 1940-1947, petitioner purchased two combination annuity and life insurance policies from the Sun Life Insurance Company. The premium on one policy was $3,000 a year. The premium on the other policy was about $5,000 a year. In each return for the years 1940-1947, petitioner substantially understated the fees which he received for his personal services during *283 the year from clients. Petitioner filed, for each of the years 1940-1947, inclusive, false and fraudulent returns with intent to evade tax. A part of the deficiency for each taxable year is due to fraud with intent to evade tax. Opinion The issue presented is whether each return for the taxable years involved was false or fraudulent, and whether all or part of the deficiency for each year is due to fraud with intent to evade tax. The burden is upon the respondent to prove fraud by clear and convincing evidence. In analyzing and considering the evidence, we have been aware of the rules regarding proof of fraud and have had regard for the admonition that fraud is never to be presumed; that negligence does not constitute fraud; and that fraud is not to be found from evidence which at best creates only doubt and suspicion. Walter M. Ferguson, Jr., 14 T.C. 846, 849; Nicholas Roerich, 38 B.T.A. 567, 584, affd. 115 Fed (2d) 39, certiorari denied, 312 U.S. 700. "Whether or not the respondent has sustained the burden of proving fraud is to be determined from the entire record and not merely from the affirmative evidence presented *284 by him." Harry Feldman, 34 B.T.A. 517, 520; L. Schepp Co., 25 B.T.A. 419, 440; William W. Kellett, 5 T.C. 608, 616; Wallace H. Petit, 10 T.C. 1253, 1257. The facts have been set forth at length. It is necessary, however, to set forth observations about the record in this proceeding. The respondent introduced evidence which showed very clearly that in the returns for 1943 and 1946, the petitioner reported as his entire gross income from his professional business, fees paid by only 7 and 9 clients, respectively, whereas he received payments from about 90 clients in 1943 and 197 clients in 1946. The respondent introduced into evidence tabulations based upon bank deposit slips and cancelled checks which showed that in all of the years in question petitioner's gross and net receipts from his profession were greatly in excess of the amounts reported in the returns. For the eight taxable years, the total gross business receipts were $313,199.58 more than were reported in petitioner's returns, and net professional income was understated to the extent of $168,801.17. The respondent introduced evidence which shows that in each of the years *285 1940, 1941, 1944, 1945, and 1946, petitioner received payments from more than 100 clients, in 1947, from over 200 clients, in 1942, from about 87 clients, and in 1943, from about 90 clients. The evidence shows, also, that the petitioner determined the rates and amounts of his fees and retainers; that he kept a lawyer's daily diary in which he entered the hours of his services to clients; that he computed or gave to his secretary each month the fees he charged for his services to each client, exclusive of any costs and expenses of clients; and that bills were sent to clients each month. All of the evidence referred to above establishes an inference which stands unrefuted that the petitioner consistently and repeatedly, for each of the eight years in question, failed to report all of the fees paid to him for his personal services by all of his clients. The respondent took into account all expenses of petitioner's business which comprised two general classes, the expenses of operating his office and carrying on his business, and the costs and expenses incident to all clients' problems. He found that in all of the returns, expenses were understated just as gross professional receipts *286 were understated. Nevertheless, upon giving full allowance for total expenses, of every type, net professional income exceeded substantially the reported net professional income, and the differences between reported gross professional income and the gross income determined by the respondent was not accounted for by the omission in the returns of any items of expense. That is to say, the respondent's evidence shows that the annual understatements of professional net income were not the result of off-sets of items of clients' costs and expenses against reimbursements or prepayments thereof by clients. Not only has the petitioner admitted that his gross and net professional income for each year was the amount determined by the respondent, and that his gross and net professional income was substantially understated in each return, but he has failed to introduce credible evidence to explain the undisputed understatements in his returns, or to establish that the understatements were either justifiably the result of innocent errors, or were, at the most, the result of negligence. The petitioner advances two grounds in explanation: One is that he had nothing whatsoever to do with the bookkeeping *287 records of his professional business, and with the preparation of his returns; and that he relied wholly upon others to correctly and properly prepare his returns. The other is that his secretary kept his accounts and the agents who prepared his returns followed a system of excluding from receipts and expenses, the costs chargeable to clients, which were distinct from fees for personal services, which were reimbursable expense items. We have considered petitioner's explanations very carefully and are unable to conclude that they refute the respondent's evidence, or require the conclusion that the respondent has failed to meet his burden of proof. As is shown hereinafter, the petitioner's disavowals are neither credible, nor reasonable, nor convincing. The petitioner obviously knew what his charges for his professional services were in each year; he fixed his fees and told his secretary what to charge clients. There is evidence that most of petitioner's clients paid the bills sent by petitioner's office during the year in which the bills were sent. There is no evidence about the actual amounts of accounts receivable from clients at the end of any of the years involved, and from the *288 evidence before us it is clear that accounts receivable from clients at the end of each year, assuming that some existed, cannot possibly account for the large understatements of income of each taxable year. Petitioner had complete control over the two bank accounts which he maintained for his professional receipts and disbursements, and he is presumed to have had knowledge of all deposits, withdrawals, and bank balances because he received bank statements and cancelled checks. During the war years, petitioner's practice involved very little litigation so that actually petitioner was not paying large litigation expenses for clients. One of petitioner's secretaries testified that she could not recall any instances where it took several years to collect from clients advances made on their behalf. Petitioner has made no effort in this proceeding to substantiate his assertion that advances for clients were so large as to account for the consistent and repeated understatements of income for the taxable years. He has not relied upon any privilege between lawyer and client as a reason for his failure to present such substantiation of his assertion. Cf. Mauch v. Commissioner, 113 Fed. (2d) 555, *289 affirming 35 B.T.A. 617. He has not established that clients' funds were commingled with his own in his bank deposits so that his bank deposits do not reflect his actual gross income. If he handled funds of clients to any great extent he, as a lawyer, must be presumed to know the need for keeping the funds of clients in separate accounts, as a fiduciary would do. Since the petitioner admits that his income was understated, we do not have before us an issue under which it would be petitioner's burden of establishing facts relating to the amounts of gross receipts from fees, the amounts of account receivable from clients, and the amounts of clients' funds held, if any. But the issue which is before us, involving the question of understatement of income with fraudulent intent to evade taxes involves petitioner's explanations by way of rebutting the inferences to be drawn from the respondent's evidence. Petitioner has failed to give a credible explanation for the large understatements of his income. What was stated by this Court in Arlette Coat Co., 14 T.C. 751, 756, applies with equal force here: "Where over a course of years an intelligent taxpayer and business *290 man has received income in substantial amounts, as shown by this record, and has failed to report that income, * * * and no tenable explanation was offered for the failure to report the income received, the burden of the respondent, in our judgment, is fully met. * * *" See, also, Charles A. Rogers, 38 B.T.A. 16, affd. 111 Fed. (2d) 987, Louis Halle, 7 T.C. 245, affd. 175 Fed. (2d) 500, certiorari denied, 338 U.S. 949. The petitioner takes the position that he was so busy with his professional work in each year, involving traveling, that he gave no attention to what his accounting records and bank records, and income tax returns showed. In effect, to put it bluntly, he takes the position that the above were not his responsibility. This attitude is neither reasonable nor persuasive. Petitioner admits that he signed his income tax returns for each year. He says that on one or more occasions he signed blank returns, leaving everything to his agent who prepared his returns. But a taxpayer may show this good faith by filing amended returns, if errors are made in his original returns, if he has the intent of filing *291 correct returns. No one is too busy to demonstrate good faith and to correct honest mistakes even if that must be done belatedly. It is to be presumed that at some time, petitioner read the copies of the returns which were filed. We are unable to believe, from the record before us, that petitioner did not know that his returns repeatedly disclosed only a small part, each year, of his true professional income. The gross discrepancies between his reported and his correct net professional income are too great, too many, and too persistent to have occurred without the petitioner's knowledge, and an intention on his part to deliberately evade taxes. The instant case presents no technical or complicated problems of tax accounting. Petitioner cannot shift to others the onus for his repeated failures to report in his tax returns the large amounts of professional income which he admittedly received. It is well settled that a taxpayer cannot escape responsibility for filing a correct tax return by committing its preparation to others. "The return as made was his return and he must suffer the consequences if it is false." Harry Feldman, supra, page 521, and cases cited. See, also, *292 Irving Fisher, 30 B.T.A. 433, 443; Estate of Louis L. Briden, 11 T.C. 1095, 1135, affd. sub nom. Kirk v. Commissioner, 179 Fed. (2d) 619. The evidence is clear that at all times material hereto petitioner maintained and retained the basic records, at least, from which his professional gross and net income for each year could be determined with substantial accuracy. On two occasions there was submitted to the respondent's agents, at their request during the course of investigations of petitioner's tax liability for two of the years involved, 1943 and 1946, lists which purported to show the names of petitioner's clients and the amounts he received from them in those years. Those lists, in fact, disclosed only a few of the petitioner's clients and only a fraction of his professional receipts for 1943 and 1946. The petitioner disclaims any knowledge of how the lists were prepared, and offers no explanation of why they contained receipts from only a few of his clients. However, the purpose for which the lists were submitted appears clear. The gross receipts from clients for 1943 and 1946, as shown by the lists corresponded with the gross receipts *293 from clients reported by the petitioner for those years. The lists were offered to respondent's agents as supporting evidence of the amounts of gross receipts reported, and their only purpose and effect was to decive the Government. We are unimpressed by the petitioner's protestations of ignorance of his business and personal affairs, and his attempt to disassociate himself from any guilty knowledge or wrong doing. The conclusion is inescapable, on the basis of the entire record that the petitioner intended to understate his true professional income in each of the years involved, and that he deliberately pursued a course of conduct calculated to evade taxes. It is held that the petitioner filed false and fraudulent income tax returns, in each of the years 1940 to 1947, inclusive, and that a part of the deficiency for each of those years was due to fraud with intent to evade taxes. Therefore, the assessments of deficiencies and the additions to the tax for the years 1940 and 1941 are not barred by the statute of limitations, and the provisions of section 6 of the Current Tax Payment Act of 1943 are not applicable with respect to the years 1942 and 1943. It is held, also, that *294 the penalty under section 294(d)(2) has been determined properly. The penalty is mandatory under the statute. The petitioner claims that he is entitled to a credit of $757.07 for the year 1947 due to overpayment of tax, as reported, for 1946. This Court has no jurisdiction over the collection of taxes. Presumably the respondent will give effect to all payments of tax for the years involved in making collections under the decision of the Court in this case. Decision will be entered under Rule 50. Footnotes
1. The parties have stipulated what amounts of income tax for each of the years involved were paid by petitioner. Prior to the investigation which led to the issuance of the deficiency notice which gave rise to this proceeding, "office audits" were made of petitioner's returns by respondent's agents which resulted in small deficiencies, or overassessments, credits, refunds, and so forth. All of this is incorporated by reference instead of being set forth in our findings of fact.↩
*. For 1942 and 1943 without "forgiveness." ↩
**. By office audit, the tax was reduced to about $7,798.71, and $7,920.21 was in part refunded and in part applied to other tax due. ↩