Ryanco Sales Company, Inc. v. Commissioner.
Ryanco Sales Co. v. Commissioner
Docket No. 72187.
United States Tax Court
T.C. Memo 1961-327; 1961 Tax Ct. Memo LEXIS 25; 20 T.C.M. (CCH) 1689; T.C.M. (RIA) 61327; December 1, 1961
William G. O'Neill, Esq., for the petitioner. Albert Squire, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years ended June 30, 1955, and 1956, in the amounts of $9,127.36 and $9,706.76, respectively. Petitioner claims an overpayment for the year ended June 30, 1956, based on the carryback of a net operating loss from the year ended June 30, 1959. Each party has conceded certain issues, leaving for decision the following: 1. Whether petitioner is entitled to a deduction in excess of $9,300 for the year ended June 30, 1955, and $10,500 for the year ended June 30, 1956, as a reasonable allowance for salaries for services *26 rendered by Ethel Ryan. 2. Whether petitioner is entitled to a deduction in computing its net operating loss for the year ended June 30, 1959, to be carried back to the year ended June 30, 1956, of an amount in excess of $7,500 as a reasonable allowance for salary for services rendered by Charles A. Ryan. Findings of Fact Petitioner is a corporation organized on July 1, 1953, under the laws of Pennsylvania, having its office and place of business in Philadelphia. Its books are maintained and its income tax returns filed on an accrual basis for fiscal years ended June 30. The returns for each of the years here involved were filed with the district director of internal revenue at Philadelphia, Pennsylvania. Petitioner was in the business of rack jobbing, and its major operations during the taxable years 1955 and 1956 consisted of selling nonfood items such as plastic and metal housewares and toys which it bought from manufacturers to American Stores Company, hereinafter referred to as American, for resale through American's stores in the Philadelphia area, south and central New Jersey, and portions of Delaware and southeastern Pennsylvania. American operates a chain of retail *27 food markets throughout the middle Atlantic States, its markets being known as Acme Markets. Its main office is located in Philadelphia, Pennsylvania. Petitioner's sales to American were made under a contract, requiring it to take back at full credit items which could not be sold in the food markets. Deliveries to American's various stores were made by petitioner's driver-salesmen. These driver-salesmen visited each store weekly, placed new merchandise on the racks, noted what items had been sold since their last visit, took back unsalable items, and straightened out the racks. The number of American stores which petitioner serviced as a rack jobber varied, but the maximum number of stores serviced at any one time was about 180. Prior to petitioner's incorporation, the business which is conducted had been carried on by a partnership composed of Charles A. Ryan, hereinafter referred to as Charles, and Ethel Ryan, hereinafter referred to as Ethel, husband and wife. The partnership between Charles and Ethel was formed on October 1, 1952, and continued until organization of petitioner on July 1, 1953. From January 1, to September 30, 1952, Charles had operated the business as an *28 individual proprietorship and in 1951 had operated it in partnership with his 25-year old son. Of the 100 shares of stock originally issued by petitioner, Charles owned 48, Ethel, 51, and one share was owned by Reta Girard. Sometime after petitioner's incorporation, the one share of its stock held by Reta Girard was transferred to Charles. Other than this transfer, there has been no change in the shareholders of the petitioner since its incorporation. On July 1, 1953, Charles, Ethel, and Reta Girard were elected to be petitioner's directors, and there have been no changes in its directors since that date. In July 1953 Charles was elected as petitioner's president, Ethel as its treasurer, and Reta Girard as its secretary, and Ethel was appointed to act as assistant secretary. There have been no changes in petitioner's officers since July 1953. Charles began his career in merchandising about 1924 as a buyer and merchandiser for a Buffalo, New York, department store, which had at that time a volume of sales of about $10,000,000. Charles' duties were to plan and set up the food division of this store including its grocery and candy sales department and its restaurant operations. Charles *29 remained in this position until 1933 at which time he took a similar position with Abraham and Strauss Company, a large department store in Brooklyn, New York. In his position with Abraham and Strauss Company he was authorized to purchase the needs of the food department and to allocate the space in the department on the basis of his decision as to the salability of the various items. He was responsible for the expenditure of as much as several million dollars a year. During this time Charles was doing research work involving supermarket operations. In the middle 1930's be became employed as a merchandising consultant in the supermarket field. He was retained by Reynolds Wholesale Grocery Company to set up for them a pilot supermarket operation in New York City. This entailed supervising the layout of the architectural work for floor space, purchasing equipment for various departments, arranging advertisement plans, and purchasing merchandise to stock the stores. This project took a period of approximately 9 months. Thereafter, he was retained as a consultant by Interstate Department Stores to set up food departments in their stores, and later by Twentieth Century Markets in Madison, *30 Wisconsin to revamp a market which was operating at a loss. Around 1939 or 1940 Charles was retained by Kroger Company which operated a chain of food stores. Charles was employed to work with the vice president in charge of operations in the converting of smaller stores to supermarkets. Kroger Company gave him the title of Assistant to the Vice President in charge of operations. Charles continued working for Kroger Company until 1942 when he entered the military service as a captain in the United States Army. He was assigned to the Special Services Division, responsible for the operation of Post Exchanges. He was in charge of the food department of the Post Exchanges of the Seventh Service Command. His headquarters was in Omaha, Nebraska, and his work consisted of going to the various Post Exchanges and setting up their food departments. He continued to serve in the United States Army until late 1945 or early 1946 at which time he had the rank of major. After leaving the military service, Charles spent further time in research in connection with supermarket operations. During the course of this research, he developed the thought that nonfood items would increase the gross profit *31 of supermarkets, and he compiled a 750-page study containing information of the results of his studies of shopping habits, stamp plans, premium shopping, and similar considerations. In 1948 or 1949 Charles rented a store in Buffalo, New York, which he operated for the purpose of experimenting with his idea of the profitability of sale of nonfood items in food markets. Ethel assisted him in the operation of this store. Charles continued his study of shoppers' habits while operating this store, determining what nonfood items appealed to customers and the various price ranges which seemed to move best. Around 1950 Charles ceased operating this store, and he and Ethel came to Philadelphia. Charles presented his plan to executives of American and in 1950 or 1951 he sold some cutlery to American on a test basis. The test was successful and the business with American grew and continued to grow during the years ended June 30, 1955 and 1956. During the period from 1950 to 1956 the number of stores operated by American in the area which petitioner serviced increased and a part of petitioner's increase in sales was due to the larger number of stores operated by American. Ethel, for approximately *32 7 1/2 years prior to 1934, was an assistant buyer in the food section of a department store in Buffalo, New York. Her salary was $35 a week and her duties consisted of taking part in some of the buying for this department of the store and being in charge of about 40 employees in the department. She set up the work schedules of these employees and the manner of carrying out the work. When Charles and Ethel came to Philadelphia, Ethel continued to assist in the business operated by Charles and his son and by Charles as a sole proprietorship in somewhat the same way she had assisted in the operation of the experimental store in Buffalo. She was not compensated for her work but she did spend substantial time in the office at the warehouse which the business operated. Beginning in October 1952 when the partnership between Charles and Ethel was formed, Ethel spent full time working in the warehouse office. After formation of petitioner, Ethel began to spend long hours at petitioner's warehouse office, and during petitioner's fiscal years 1955 and 1956 generally worked around 70 hours a week including working on Saturdays and Sundays and some weeks worked as much as 90 hours. She took *33 full charge of the items returned from the stores, separating out the returned items which could be salvaged. She went through the warehouse and checked the inventory for merchandise that needed to be purchased and wrote up the orders for merchandise and interviewed salesmen who came to petitioner's office. Generally, Ethel and Charles dealt with the salesmen who came into the office together, but when Charles was not in the office, Ethel dealt with them alone. Charles made most of the decisions regarding petitioner's purchases although he often consulted Ethel before making a final decision, and Ethel had authority to, and did occasionally, make purchases of new items without consulting Charles, but she usually consulted him before making any such purchases. Ethel had complete responsibility for establishing routes of the drivers which she did by use of lines and pins on a map. She also had complete charge of checking incoming shipments against invoices and freight bills and filing claims if necessary for shortages although at times Charles helped her in filing such claims. It was necessary for Ethel to work late very often because of the late hours at which the drivers came back *34 to the warehouse and she was required to stay at the warehouse in order to check the items taken out and returned by the drivers. Ethel made up the invoices for billing to American, and Charles and Ethel both would work on Sundays on the sales invoices. On Sundays Charles would type the sales invoices which Ethel prepared in draft form. Ethel, on a number of occasions, advised Charles with respect to the salability of certain types and colors of merchandise. A manufacturer's agent is a sales agent who represents various manufacturers and carries the different manufacturers' line of goods, making sales to retail merchants or jobbers for a commission. Manufacturers' representatives who came to petitioner's office always found Ethel present when the office was open, and two such representatives were impressed by the fact that Ethel was the only person doing administrative or office work at petitioner's office when they came to call, where other concerns with which they dealt would have several people in the office. Ethel did not make any entries in petitioner's payroll book or other books of account. The entries therein were made by a public accountant who visited the office once *35 or twice a week for this purpose. Petitioner's warehouse employees whom Ethel supervised were young people who each earned about a dollar an hour, their combined wages in the fiscal year 1955 amounting to $3,600 and in the fiscal year 1956, to $4,700. Ethel's duties as petitioner's treasurer and assistant secretary did not require more than incidental services. The most difficult part of petitioner's business was educating the general merchandise men, the division and district managers and store managers of American, to the higher profits obtainable from sales of petitioner's nonfood merchandise as compared to profits from food sales. The employees of American knew nothing about selling petitioner's nonfood items. In its fiscal years 1955 and 1956 Charles took complete charge of the educational program of petitioner. Ethel did not work outside the office. Charles initiated and developed petitioner's contacts with the executives of American and with the store managers. On August 31, 1953, petitioner's board of directors, comprised of Charles and Ethel, passed a resolution that: CHARLES A. RYAN and ETHEL RYAN, as Officers, Directors, and Manager and Assistant Manager of the RYANCO *36 SALES COMPANY, INC., are hereby authorized salary not to exceed ten (10%) per cent of the gross sales of the business per fiscal year, said salaries to be payable weekly by a salary of $400.00 for CHARLES A. RYAN and $300.00 for ETHEL RYAN, with the right of the Officers to adjust the amount of the salary or waive the salary to be paid within the ten (10%) per cent limitation set. The minutes of January 4, 1954, show that the board of directors resolved that Charles and Ethel will draw their authorized salaries of $400 per week for Charles and $300 per week for Ethel to commence in January 1954 and that any additional accrual up to the 10 percent limitation on salaries was being waived. On June 10, 1955, a board of directors' meeting was held at which the only directors present were Charles and Ethel. The minutes of this meeting state in part: A motion was made and seconded to draw a check in the amount of $4,500.00, payable to ETHEL RYAN, and a check in the amount of $4,500.00 payable to CHARLES A. RYAN, to cover the balance of salaries due to end fiscal year because of increased sales. Included in the deduction taken by petitioner for salary to Ethel of $11,800 in its fiscal *37 year 1955 is the $4,500 accrued on petitioner's books on June 30, 1955, in accordance with the above minutes. This amount was not paid to Ethel until September 1955. Petitioner, for its fiscal year 1956, deducted salary to Ethel of $15,000 which was paid as follows: From July 1, 1955 to August 1955, at the rate of $300 per week; from August 1955 to January 4, 1956, at a weekly rate not shown; from January 4, 1956 to June 30, 1956, at the rate of $300 per week. On June 1, 1956, a board of directors' meeting was held at which the only directors present were Charles and Ethel. The minutes of this meeting state in part: A motion was made and seconded to authorize the payment of additional salaries due in the amount of $4,500.00 to ETHEL RYAN and $4,500.00 to CHARLES A. RYAN because of increased sales. Included in the deduction taken by petitioner on its income tax return for salary to Ethel in the amount of $15,000 for its fiscal year 1956 is the $4,500 accrued on petitioner's books on June 30, 1956. This amount was not paid to Ethel until September 1956. Petitioner has never paid a dividend. At least one meeting of petitioner's board of directors was held in each fiscal year, but *38 the minutes of these meetings contain no mention of the subject of dividends. Prior to 1953 the partnership had no written contract with American but dealt on an informal basis. On May 25, 1953, a contract between American and the partnership was entered into which provided that the partnership would supply American with merchandise and that the price to be paid by American was list price less 25 percent with a 1 percent discount for payment within 10 days. The contract was terminable at the will of either party. Petitioner acquired this contract upon its incorporation. Although the contract required no notice of termination, American had a policy of giving 30 days' notice. Upon notice by American of the termination of the contract, petitioner would have had 30 days within which to close out its departments in each of American's stores. Petitioner would have been required by the contract to repay to American the amounts which American had paid to it upon delivery of merchandise to the extent of the inventory remaining unsold at the end of the 30-day period from notice of termination of the contract. In managing petitioner's affairs, it was necessary for the officers and directors *39 to consider the possibility of a potential liability for repaying American some amount after 30 days' notice of termination of its contract. Early in 1957 Charles became aware that petitioner's relationship with American was becoming strained. After discussion between Charles and executives of American, American proposed that it buy petitioner and bring Charles into American as an employee. Charles did not accept this proposal and late in 1957 American terminated its contract with petitioner. After the contract with American was terminated, petitioner's business dropped off and during its fiscal year 1959 it had very little business, its total sales in this year amounting to $17,701.82, its gross profits from these sales, to $2,485.93, and total salaries and wages of employees other than Charles and Ethel, to $2,496.75. The gross sales of petitioner as shown on its income tax returns for the taxable years ended June 30, 1954, 1955, 1956, 1957, and 1958 were $290,292, $383,153, $559,577, $931,691, and $564,582, respectively. By February or March of 1958, petitioner had no driver-salesmen and very little business. Charles and Ethel both continued to go to the office every day, *40 and Ethel generally spent the major portion of the day at the office. During the fiscal year 1959 Charles' main activities consisted of visits to stores of large food market chains noting the time customers spent in the nonfood departments, what items they bought, and the amount of space the nonfood departments occupied. He was preparing a plan to present to a large chain store. At some time prior to March 1961, Charles did present his plan to one large chain store and was near to entering into a contract with them when his negotiations proved unsuccessful. Charles has since been engaged in attempting to sell the plan to another large chain and had not concluded such negotiations at the time of the trial of this case in March 1961. At a meeting of petitioner's board of directors, it was decided to reduce Charles' salary to $300 per week and Ethel's to $100 per week effective July 11, 1958, until such time as new contracts could be negotiated with the food chains. Petitioner, on its income tax return for its fiscal year 1954, deducted salary to Charles of $15,500 and to Ethel of $6,950, and such deductions have not been questioned by respondent. Petitioner, on its income tax return *41 for its fiscal year 1955, deducted $33,800 as compensationofo officers consisting of salary to Charles of $22,000 and salary to Ethel of $11,800. For its fiscal year 1956 petitioner, on its income tax return, deducted $33,500 as compensation of officers consisting of salary to Charles of $18,500 and salary to Ethel of $15,000. Respondent disallowed a portion of the salary to Charles in each of these years but has conceded on brief error in this regard. He disallowed as excessive compensation to Ethel $2,500 in petitioner's fiscal years 1955 and $4,500 in its fiscal year 1956. Petitioner, on its income tax return for its fiscal year 1959, reported a net loss of $33,081.38. In computing this loss it deducted salaries to Charles and Ethel in the amount of $21,100, composed of salary to Charles of $15,800 and salary to Ethel of $5,300. Respondent has conceded on brief that petitioner is entitled to a deduction of the salary paid to Ethel in its fiscal year 1959 in the amount of $5,300 and that petitioner is entitled to a deduction to the extent of $7,500 for salary paid to Charles in its fiscal year 1959, but contends that any amount in excess of $7,500 is not reasonable compensation *42 for the services rendered by Charles during its fiscal year 1959. Ultimate Findings of Fact Reasonable compensation for the services rendered by Ethel to petitioner in each of its fiscal years 1955 and 1956 is $11,000. Reasonable compensation for services rendered by Charles to petitioner in its fiscal year 1959 is $7,500. Opinion Section 162(a) of the Internal Revenue Code of 1954 provides for a deduction to a taxpayer of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business including a reasonable allowance for salaries or other compensation for personal services rendered. The amount of reasonable compensation for personal services rendered is a question of fact governed by the circumstances present in each case. California Vegetable Concentrates, Inc., 10 T.C. 1158 (1948). The burden is upon petitioner to prove by evidence the services rendered and their value. Where the payments are to shareholders and relatives, the proof must clearly establish that the payments were not made because of family considerations and were not disguised distributions of profits. L. Schepp Co., 25 B.T.A. 419, 429 (1932). *43 We have set forth in some detail the facts with respect to the services rendered to petitioner by Ethel in its fiscal years 1955 and 1956 and the resolutions of the board of directors with respect to the compensation to be paid to Charles and Ethel. Ethel worked long hours and rendered valuable services to petitioner. In our ultimate finding, determining the amount of reasonable compensation for her services, we have taken these facts into account. We have also considered the fact that many of Ethel's duties were clerical in nature and that insofar as the record shows she was not employed in any business activity from 1934, when she left an assistant buyer's position in which she was paid $35 a week, until she began to assist Charles in his business in 1948 or 1949. We have considered the facts that Ethel owned 51 percent of petitioner's stock, that petitioner has paid no dividends since its organization, and petitioner's need for a cash reserve in the event its contract with American was terminated. Upon consideration of all the facts of record in this case, we have found, and we hold, that reasonable compensation for the services rendered by Ethel to petitioner in each of its fiscal *44 years 1955 and 1956 is $11,000. While the record is replete with evidence of Charles' experience in the merchandising field and his services to petitioner during the years prior to its fiscal year 1959, the evidence with respect to the services Charles rendered to petitioner during its fiscal year 1959 is most unsatisfactory. The record shows that he was making further studies with the hope of negotiating another contract for petitioner. There is no showing of how these further studies were intended to be of financial benefit to petitioner in the fiscal year 1959 or thereafter or why petitioner had need of these studies. Exactly when Charles expended efforts in attempting to negotiate another contract for petitioner or the time he spent in this undertaking is not shown. He had not at the date of the trial of this case in March 1961, been successful in obtaining another contract for petitioner and was still working toward that end. The record does show that both Ethel and Charles went to petitioner's office during the fiscal year 1959 on a regular basis. Respondent has conceded that the $5,300 paid by petitioner to Ethel in its fiscal year 1959 was reasonable compensation for her *45 services. Charles is entitled to some compensation for his services to petitioner in its fiscal year 1959 but the evidence is insufficient to show that reasonable compensation for the services rendered by Charles to petitioner in that year was in excess of the $7,500 conceded by respondent to be deductible in computing petitioner's net operating loss. Upon consideration of all the evidence of record, we hold that $7,500 constituted reasonable compensation for the services rendered by Charles to petitioner during its fiscal year 1959. Decision will be entered under Rule 50.